# STATE OF MICHIGAN

# COURT OF APPEALS

LAUREN GOHL, as Next Friend of J.G., a minor,

        Plaintiff-Appellees,

v

SHARON TURBIAK, DR. RANDY LIEPA, CANDY SOKOL, SHELLY MOORE, NANCY RESPONDEK, MEGAN SPROW, CAROL DEBEAUDRY, TRACY CREWS, DIANE SLOBODA,

        Defendant-Appellants,

and

CYNTHIA DEMAN and ELIZABETH SANTER,

        Defendants.

UNPUBLISHED
May 3, 2018

Nos. 335389 and 335604
Wayne Circuit Court
LC No. 15-014274-NO

Before: BOONSTRA, P.J., and BECKERING and RONAYNE KRAUSE, JJ.

PER CURIAM.

This consolidated appeal arises from allegations of abusive behavior by former special education teacher, defendant Sharon Turbiak, toward JG, who at the time of the alleged abuse was a preschool student in her classroom, and from the alleged failure of the other named defendants to report Turbiak's behavior toward JG and others. Plaintiff is JG's mother and duly appointed next friend. Defendants moved for summary disposition under court rules MCR 2.116(C)(7) (immunity granted by law), (C)(8) (failure to state a claim) and (C)(10) (no genuine issue of material fact). In Docket No. 335389, defendants appeal by right the trial court's denial of their consolidated motion for summary disposition on the basis of governmental immunity. In Docket No. 335604, they appeal by leave granted the trial court's denial of their motion pursuant

-1-

to MCR 2.116(C)(8) and (C)(10).[1] We consolidated these two claims of appeal for administrative efficiency.[2] For the reasons stated below, we affirm in part, reverse in part, and remand the matter for further proceedings.

## I. STATEMENT OF PERTINENT FACTS AND PROCEEDINGS

JG was born with hydrocephalus, a condition in which fluid accumulates in the brain. Doctors inserted a shunt to drain excess fluid from the area around JG's brain into his abdomen, and by the time of the events underlying this appeal, JG had had multiple surgical procedures to reposition the shunt or because of infections. A May 2011 evaluation described JG as "demonstrating significant delays in Gross Motor, sensory skills, Language and Cognitive domains" as well as some "behavioral concerns."

JG began attending the Moderate Cognitive Impairment ("MoCI") Program operated by Livonia Public Schools ("LPS") in 2011. The MoCI program provides educational, developmental, therapeutic, and social services for students with IQs below 55. The program for preschoolers was at Webster Elementary School in Livonia, and consisted of morning and afternoon sessions held four days a week. JG attended the morning sessions, which ran from 8:00 a.m. until 11:00 a.m., and Turbiak was the special education teacher assigned to JG's classroom. Turbiak was assisted by two paraprofessionals, defendants Nancy Respondek and Candy Sokol. In addition, a number of specialists provided services to the children in Turbiak's classroom. Defendant Carol DeBeaudry provided occupational therapy services to students in the morning class, defendant Tracey Crews provided occupational therapy services to students in the afternoon class, and defendant Maegan Sprow, a speech pathologist, worked with students in the afternoon class. Defendant Diane Sloboda was a social worker for the MoCI programs at Webster and at Emerson Middle School. Defendant Shelli Moore was principal of Webster Elementary, and defendant Randy Liepa was superintendent of LPS.

The parties rely in part on a "timeline" document produced by Moore, the relevant details of which she confirmed during her sworn deposition testimony. On October 24, 2011, several defendants complained about Turbiak's treatment of staff and students to Program Specialist Santer, who relayed their concerns to Moore. According to Moore's account, Santer reported that Turbiak was "harsh to students, yelled loudly in their faces and in general was not using best practices when interacting with the pre-schoolers." Moore responded by speaking with the individuals who had lodged complaints with Santer. Crews told Moore that Turbiak's classroom was "a very uncomfortable place to work, and that she and others were always afraid that Mrs. Turbiak would trash them if they questioned her." Sprow also reported "concerns she had about the treatment of children in the preschool classroom." According to Moore, Sprow thought

---

[1] The trial court entered orders granting summary disposition to defendants Cynthia DeMan, Director of Personnel, and Elizabeth Santer, Program Specialist. Consequently, they are not participating in this appeal.

[2] *Gohl v Turbiak*, unpublished order of the Court of Appeals, entered March 3, 2017 (Docket No. 335604).

Turbiak pushed on children's shoulders with too much force when putting them in timeout, was frustrated by the lower-functioning students, who were particularly vulnerable to potential rough treatment, and let students with balance and mobility issues fall rather than help them transition to a chair or the floor.[3] Sprow testified at her deposition that she also told Moore that on one occasion, Turbiak said, "Watch this," said "No!" to a student, and then laughed when another student, who was auditory defensive, covered her ears and started crying. When Sprow told Turbiak that she could not do that, Trubiak reportedly said, "Oh, come on, that's just a joke." DeBeaudry also spoke with Moore about the climate in Turbiak's classroom, reportedly "label[ing] the treatment of students as gruff and abrupt, and not[ing] that Mrs. Turbiak appeared more harsh and abrupt with the lower functioning students. [DeBeaudry] gave an example of [Turbiak] forcing a student to eat cereal with the student gagging and crying." DeBeaudry also told Moore that "children were picked up from the floor by one arm and that there was the potential to dislocate a small shoulder."

Moore contacted DeMan, LPS Director of Personnel, for guidance, after which she met with Turbiak to discuss the complaints against her. Moore reported that Turbiak cried intermittently during their 90-minute meeting, expressed surprise that she was assigned to Webster, said she felt unappreciated there, and confided that she "was stressed out because of the level of disability of her students and the reduction of support." Turbiak did not directly admit that she was harsh or aggressive with the children, but said she was not "touchy-feely" and could be loud and abrupt with the children because she had high expectations and wanted them to learn and to progress in her classroom. Moore wrote in her timeline that Turbiak asked several times who had reported her, but she told Turbiak that the complaints had come from the morning and the afternoon class and that it would be inappropriate to confront anyone about their conversation because one might see such inquiry as making the workplace hostile. Turbiak reportedly talked about changes she would make in her teaching, "making very broad statements like she wouldn't be touching any child, that they were only going to play [i]n her room instead of trying to teach anything and that it was fine with her if that's what people thought was best for children." Moore said she counseled Turbiak not to make sudden changes in the classroom routine and to take a few days to process their conversation, and she assured Turbiak of her continued support.

The following day, Turbiak took her students to a neighboring room and had the teacher in that room watch them while Turbiak held a "team meeting" in her own classroom. According to Moore's report, Turbiak said to those at the meeting that "she had no friends only colleagues in the building," told them that someone had reported her to Moore, said she could no longer trust anyone, and that she would do everything in her power to find out who had ratted her out.

---

[3] Regarding one of the children with balance issues, Sprow testified at her deposition that while Turbiak was working with the child on how to go from standing to sitting in a cube chair, the child locked her knees and balanced herself on the chair and could not make the transition. Sprow said that Tubiak jostled the chair so that the child lost her balance and fell the short distance to the floor. Sprow thought this was inappropriate, but could not tell what Turbiak's intent was. At her deposition, Turbiak offered a pedagogical explanation for what she did and why.

DeBeaudry went to Turbiak's classroom at around 9:00 a.m. and discovered that the students were still in the neighboring classroom. She told Moore that Turbiak was "still crying and recounted the conversation [Moore] had had with her, again stating that she couldn't trust anyone and would ask everyone about this situation until someone grew the balls to tell her that they had gone to talk to [Moore]."

DeMan met with Turbiak on November 2, 2011, subsequent to which she issued a letter memorializing their conversation and warning Turbiak that "future inappropriate actions or omissions will lead to disciplinary action." DeMan testified at her deposition that their meeting focused on the work environment in Turbiak's classroom, an emphasis reflected in DeMan's letter to Turbiak. In the letter, DeMan admitted that Turbiak's work in the program could be difficult, frustrating, "and possibly overwhelming, and that it required a solid working relationship with staff members and an "all hands on deck" approach that was currently missing from Turbiak's classroom. DeMan indicated that regardless of how exhausting and frustrating teaching can be, "there is never an excuse for any teacher, especially an experienced teacher as yourself, to lapse into inappropriate behaviors with either staff or students." DeMan concluded by stating what she expected Turbiak to do to remedy the fractured working relationship between her and other staff members, by expressing confidence that Turbiak's behavior was an isolated event, and by issuing the aforementioned warning. Crews, DeBeaudry, Moore, Sokol, and Sprow, among others, testified that after Turbiak spoke with DeMan, conditions in the classroom improved. In addition, Moore testified that she frequently visited Turbiak's classroom thereafter. There is no evidence that Turbiak engaged in any concerning behavior with respect to her students over the next four months.

The specific incident that gave rise to the underlying lawsuit occurred on March 5, 2012. Social worker Sloboda entered Turbiak's classroom at around 9:30 in the morning and, according to her memorandum of the incident, she "saw [Turbiak] grab [JG] by the top of the head and jerk it back quite aggressively. She also yelled 'You need to listen' very close to his face." Sloboda immediately reported the incident to Moore and then, at Moore's insistence, wrote the aforementioned memorandum. Sloboda testified at her deposition that she watched Turbiak release JG and he showed no signs of being in pain, distress, or discomfort. Moore testified that "knowing [JG] the way I did I think things could look like JG's head was being jerked around where, in fact, his head could have been supported because he was moving his head around." Nevertheless, having not seen the incident, Moore did not express her reservations or discount what Sloboda saw, and she thought Sloboda's description of the incident warranted reporting to the central office.

Moore testified that after Sloboda's report, she sought guidance from several people at the central office, and then went back to Turbiak's classroom and remained there until she could escort Turbiak back to her (Moore's) office. Moore said that while Turbiak was in her office, Turbiak "was crying. She was throwing up. She was in a fetal position in one of my chairs. And she kept . . . kind of hyperventilating." When DeMan and Human Resources Director Dorothy Chomicz interviewed Turbiak about the incident, Turbiak explained that JG had thrown a ring stacker, subsequent to which she had placed one hand under his chin and the other behind his head to protect his head because he tended to thrust it when being reprimanded, and told him that throwing toys was unacceptable. Chomicz testified that Turbiak's explanation was reasonable and that, although she was nervous, she delivered it with confidence and without any

signs of having been coached. In short, Chomicz and DeMan thought Turbiak's explanation resonated with what they knew, so they allowed her to return to her classroom.[4]

The following month, Sokol informed DeMan that she thought Turbiak was intimidating her and she could no longer work in Turbiak's classroom. DeMan relayed to Mark Schultz, Adminstrator of Employee Relations and Public Safety, that she had received information from Sokol of a "hostile workplace claim." Schultz responded by opening an investigation on April 23, 2012; on the same day, Turbiak was placed on paid administrative leave. Schultz testified that on April 24, 2012, having read written reports from Moore (the timeline), DeBeaudry, Sloboda's memo about the March 5, 2012 incident, and statements from Sokol, Santer, Crews, and Sprow, he telephoned the police to report suspected child abuse.[5] On June 12, 2012, LPS filed tenure charges against Turbiak, and the board of eduction voted to proceed with the charges. Various other defendants were disciplined, including Respondek, whose employment was terminated on June 13, 2012, for her own actions toward two students and for failing to take steps to prevent Turbiak's inappropriate conduct toward students; DeBaudry and Crews, who were disciplined for failure to report their concerns with Turbiak directly to Moore; Sloboda, who was disciplined for failure to report suspected child abuse to the proper state authority; and Moore, who was disciplined for failure to report suspected child abuse to the proper state authority, to inform plaintiff that JG's head had been grabbed, and to inform another child's parents that Respondek had spanked him.

Plaintiff removed JG from Webster in the summer of 2012. She testified at her deposition to improvements in JG's behavior while he was at Webster, but said that after she removed him, JG exhibited anxiety, a return to repetitive behaviors, and increased clinginess. Plaintiff said that JG would grab her face and turn her head to look at him if he wanted to get her attention, that he would overreact to things that she did not think should upset him, and that he was "absolutely not listening at all."

In November of 2012, plaintiff brought an action in federal district court against the school district and defendants alleging both state and federal claims. Among the federal claims, plaintiff claimed that Turbiak's alleged conduct constituted excessive force in violation of JG's rights under the Fourteenth Amendment. *Gohl v Livonia Pub Schs*, 134 F Supp 3d 1066, 1082-1083 (ED Mich, 2015). The district court dismissed plaintiff's federal claims with prejudice and her state claims without prejudice, thus allowing her to file the instant lawsuit. The court

---

[4] At her deposition, Turbiak denied grabbing JG by the head and jerking it back aggressively. She said that afterward, she pointed to the rings and, if JG was not looking in their direction, would guide his head to look where she was pointing, and that JG willingly picked up the rings. Respondek testified that JG was laughing when Turbiak removed him from his chair, that he picked up the rings, and that he started giggling when Turbiak returned him to his chair.

[5] Schultz eventually reached a Detective Burklow, with whom he met on April 26, 2012, and turned over all the information he had about Turbiak's classroom. Although the detective conducted an independent investigation, the Wayne County Prosecutor's office declined to issue any warrants, citing insufficient evidence.

concluded that Turbiak's "single act of abuse does not rise to the level of conscience-shocking behavior[,]" and, therefore, that "Turbiak's conduct did not violate [JG's] substantive due process rights." *Gohl*, 134 F Supp 3d at 1084. The district court also concluded that there was no "evidence from which a reasonable jury could find that [JG] sustained any physical injury, much less a severe physical injury, as a result of Turbiak's conduct on March 5, 2012[,]" or even "that Turbiak's alleged conduct created a serious risk of severe physical injury." *Id*. at 1085. The district court likewise rejected plaintiff's assertion that Turbiak's alledged abuse of other children in JG's presence constituted conscience-shocking emotional abuse. *Id*. Specifically, the federal court found "no record citations to substantiate the assertion that [JG] witnessed any of these alleged incidents" of abuse of other children and that the alleged incidents occurred in the afternoon sessions, which JG did not attend, or in the previous school year, before JG began attending Webster. *Id*. at 1085-1086. The Sixth Circuit Court of Appeals affirmed the district court's ruling, *Gohl v Livonia Pub Schs*, 836 F3d 672, 676 (CA 6, 2016)[6], and the United States Supreme Court denied plaintiff's petition for certiorari, __ US __; 138 S Ct 56 (mem); 199 L Ed2d 18 (2017).

After the federal district court dismissed her state claims without prejudice, plaintiff filed a four-count complaint in the instant case. In Count I, plaintiff alleged claims of gross negligence, willful and wanton misconduct, and assault and battery against Turbiak. In Count II, she alleged that defendants failed to report suspected child abuse in violation of the child protection law, MCL 722.621 *et seq*. In Count III, she alleged that all of the defendants except for Turbiak acted with gross negligence or willful and wanton misconduct, and in Count IV, she alleged that the conduct of all defendants constituted the intentional infliction of emotional distress. The parties adopted the discovery that had been conducted in the *Gohl* federal action.

As indicated above, defendants filed a joint motion for summary disposition pursuant to MCR 2.116 (C)(7), (C)(8), and (C)(10) on September 19, 2016. Subsequent to the October 11, 2016 hearing on the motion, the trial court entered an order denying summary disposition on all counts with respect to Turbiak, simply stating that there was a "question of fact as to Sharon Turbiak." As to the other defendants, the trial court granted summary disposition on plaintiff's count of intentional infliction of emotional distress (Count IV), but denied summary disposition on counts for gross negligence (Count III) and failure to report suspected child abuse (Count II). These appeals followed.

## II. ANALYSIS

### A. STANDARD OF REVIEW

The Court reviews de novo a trial court's decision on a summary disposition motion. *Dillard v Schlussel*, 308 Mich App 429, 444; 865 NW2d 648 (2014). Defendants filed a joint motion for summary disposition under MCR 2.116(C)(7) (immunity by law), (C)(8) (failure to state a claim), and (C)(10) (no genuine issue of material fact). The trial court appears to have

---

[6] Judge Clay issued an impassioned dissenting opinion. *Id*., 836 F3d at 685-698.

based its summary disposition decisions on MCR 2.116(C)(10). "In evaluating a summary disposition motion brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). A party is entitled to summary disposition where the proffered evidence fails to create a genuine issue of material fact and the party is entitled to judgment as a matter of law. MCR 2.116(C)(10). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich. 177, 183; 665 NW2d 468 (2003).

## B. ASSAULT & BATTERY CLAIM AGAINST TURBIAK

In a joint brief, defendants allege that the trial court erred by denying summary disposition as to "Count I of the complaint, with respect to the claim of assault and battery pled against Turbiak." Defendants contend that Turbiak was entitled to summary disposition based on the collateral estoppel effect of the Sixth Circuit's "findings" that establish her right to governmental immunity, plaintiff's alleged failure to establish a genuine issue of material fact with regard to assault and battery, and an application of the Paul D. Coverdell Teacher Protection Act of 2001, 20 USC §§ 7918 to 7948. We disagree.

Defendants first contend that the federal courts' dispositive rulings establish Turbiak's entitlement to governmental immunity. We review the applicability of governmental immunity de novo. *Co Rd Ass'n of Mich v Governor*, 287 Mich App 95, 117-118; 782 NW2d 784 (2010). Under Michigan law, "governmental employees acting within the course of their employment and the scope of their authority are immune from tort liability except in cases where their actions constitute gross negligence." *Tarlea v Crabtree*, 263 Mich App 80, 89; 687 NW2d 333 (2004); MCL 691.1407(2). However, this general grant of statutory immunity does not apply to an intentional tort by a governmental employee. *Sudul v City of Hamtramck*, 221 Mich App 455, 458; 562 NW2d 478 (1997). The test for governmental immunity where, as here, the plaintiff has pleaded an intentional tort is laid out in *Odom v Wayne Co*, 482 Mich 459, 480; 760 NW2d 217 (2008), which provides that a defendant may establish individual governmental immunity for an intentional tort by satisfying the following three criteria:

> (a) [t]he acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

Governmental employees bear the burden of raising and proving their entitlement to immunity as an affirmative defense. *Id.*, 482 Mich at 479.

The parties do not dispute that Turbiak's actions were undertaken during the course of her employment and that they were discretionary, as opposed to ministerial. But they do dispute whether she was acting within the scope of her authority and in good faith or without malice. Turbiak argues that these two criteria are satisfied by the Sixth Circuit's "findings" that she was acting for a pedagogical purpose and without malice or sadism, and that these findings should be given collateral estoppel effect.

Collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in that prior proceeding. *Leahy v Orion Twp*, 269 Mich App 527, 530; 711 NW2d 438 (2006). Generally, three elements must be satisfied in order for collateral estoppel to apply:

> (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties [or their privies] must have had a full [and fair] opportunity to litigate the issue; and (3) there must be mutuality of estoppel. [*Monat v State Farm Ins Co*, 469 Mich 679, 683; 677 NW2d 843 (2004) (quotation marks and citation omitted); *VanVorous v Burmeister*, 262 Mich App 467, 480; 687 NW2d 132 (2004), overruled on other grounds by *Odom*, 482 Mich 459 (2008).]

Mutuality of estoppel is not required where one party uses estoppel defensively against another party who has already had a full and fair opportunity to litigate the issue. *Monat*, 469 Mich at 691.

Turbiak claims she established she was acting in good faith or without malice when she interacted with JG on March 5, 2012, based on the Sixth Circuit's rulings concerning plaintiff's substantive due process federal claim. In reviewing plaintiff's substantive due process claim, the Sixth Circuit addressed whether plaintiff had satisfied the applicable "shocks the conscience" test used to determine whether Turbiak's conduct rose to the necessary level of excessive force to constitute an actionable claim. *Gohl*, 836 F3d at 678. It noted, "[t]he question is whether the force applied [by the government employee] caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amount to a brutal and inhumane abuse of official power literally shocking the conscience. *Id*, (quotation marks and citations omitted). To answer this question, the Sixth Circuit adopted the analytical framework employed by the Third Circuit Court of Appeals in *Gottlieb v Laurel Highlands Sch Dist*, 272 F3d 168 (CA 3, 2001). The purpose of the framework, according to the Third Circuit, was to "avoid conflating the various elements of the shocks the conscience test into a vague impressionistic standard." *Gottlieb*, 272 F3d at 173. Following *Gottlieb*, the Sixth Circuit asked the following four questions:

> a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate objective in this situation?; c) Was the force applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there a serious injury? [*Gohl*, 836 F3d at 678-679.]

-8-

The Sixth Circuit noted that these questions are "not exhaustive," and their application to determine whether conduct shocks the conscience is not merely a "counting exercise." *Gohl*, 836 F3d at 679. The appeals court concluded that no evidence refuted Turbiak's explanation that her contact with JG had a pedagogical justification, although it also noted that "a jury could conclude that Turbiak used more force than needed." *Id*. at 679. The Sixth Circuit ultimately concluded that the record evidence would not permit a reasonable to jury to find that Turbiak acted "maliciously and sadistically for the very purpose of causing harm," and that there was no evidence of "serious injury." *Id*.

In light of the unrebutted evidence the Sixth Circuit relied on in determining that Turbiak had a pedagogical justification for her March 5, 2012 engagement with JG,[7] we agree with defendants' contention that Turbiak established she was acting, or reasonably believed she was acting, within the scope of her authority. See *Odom*, 482 Mich at 480. Even though one may question the propriety of how she executed the tasks delegated to her, the scope of her authority entailed teaching, correcting, and keeping safe those students assigned to her care. See *Backus v Kauffman*, 238 Mich App 402, 410; 605 NW2d 690 (1999) (ruling that a teacher who taught at one school in the morning and another in the afternoon was acting within the scope of her authotiy when she had an auto accident while driving from one school to the other in fulfillment of her obligation to the school disctrict, even if she drove negligently and caused an accident).

However, we reject defendants' attempt to equate the good faith standard in Michigan's governmental immunity law applicable to intentional tort claims with the malice standard involved in a substantive due process claim, or to otherwise extrapolate from the Sixth Circuit's rulings as defendants urge us to do. The Sixth Circuit concluded that no evidence permits a jury to find that Turbiak acted "maliciously and sadistically *for the very purpose of causing harm.*" *Gohl*, 836 F3d at 679 (emphasis added). But it also noted that a jury could conclude Turbiak used more force than needed, so much so that her conduct bothered Sloboda enough to report her to the principal. *Id*. The federal court's "shocks the conscience" standard for assessing the viability of plaintiff's excessive force claim requires a finding of a substantially higher level of malice than those acts that subject a governmental employee to an intentional tort claim. As the federal district court stated, "a substantive due process claim is quite different than a claim of assault and battery under state tort law." *Gohl*, 134 F Supp 3d at 1084. Thus, given this substantially higher standard in the federal court, we do not consider the Sixth Circuit's conclusion regarding Turbiak's intent binding in state court.

---

[7] In order for collateral estoppel to apply, the question of fact at issue must have been "essential" to the judgment. *VanVorous*, 262 Mich App at 480. We are not convinced that the Sixth Circuit's conclusion that Turbiak had a pedagogical justification for her conduct was essential to the judgment, as it was determined as one of four "guiding questions," *Gohl*, 836 F3d at 678, among a list that was "not exhaustive." *Id*. at 679. Nevertheless, the record evidence supports the Sixth Circuit's conclusion, so we need not address whether it has been established by collateral estoppel.

We acknowledge that Turbiak consistently described the technique she used on JG as "redirecting," that Chomicz believed the explanation had the ring of truth, and that the record corroborates JG's habit of thrusting his head. Nevertheless, plaintiff presented depositional evidence that Turbiak was frustrated and sometimes overwhelmed by the needs of the students in her class, that she seemed to exploit certain children's vulnerabilities for her amusement, and that she could be harsh, abrupt, and aggressive toward her students and staff. In addition, Moore testified that Turbiak was crying, throwing up, hyperventilating, and assuming the fetal position in one of Moore's chairs after Moore removed Turbiak from her classroom following the March 5, 2012, incident. Viewing this evidence in the light most favorable to plaintiff—that Turbiak grabbed the top of JG's head and jerked it back "quite aggressively" while yelling very close to his face—creates a genuine issue of material fact with regard to whether Turbiak acted in good faith or without malice in her contact with JG, a disabled child, especially in light of his underlying condition of hydrocephalus. For this reason, we conclude that Turbiak has not established that she is entitled to governmental immunity.

For the same reasons, Turbiak is not entitled under MCR 2.116(C)(10) to summary disposition of plaintiff's allegations of assault and battery. As this Court explained in *VanVorous*, 262 Mich App at 482-483, overruled on other grounds by *Odom*, 482 Mich 459 (2004):

> To recover civil damages for assault, plaintiff must show an "intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish contact." To recover for battery, plaintiff must demonstrate a "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." [Quotation marks and citations omitted.]

Turbiak has consistently maintained that her intent in touching JG on March 5, 2012, was to protect his head while teaching him that it was not acceptable to knock toys off a table. That may be so. However, complaints had been lodged against Turbiak for purposefully mistreating students and bullying staff, and Sloboda recounted that she saw her "grab" JG by "the top of"[8] his head and "jerk it back quite aggressively" while yelling "You need to listen" very close to his face. In addition, Turbiak was in such a state in Moore's office after the alleged head-grabbing incident that Moore telephoned the central office for advice regarding what to do. A reasonable jury could conclude that Turbiak was overwhelmingly upset in that moment because she knew she had gone too far and lost her temper when handling JG. Viewing the evidence in a light most favorable to plaintiff, *Dillard*, 308 Mich App at 445, there remains a material question of fact as to whether Turbiak's actions showed an "intentional and unlawful threat or offer to do bodily injury" to JG and whether she created in JG a "fear of imminent peril." The same evidence raises a question of fact as to whether Turbiak completed the assault by committing a

---

[8] In contrast, Turbiak claimed that she had put her hand behind JG's head.

-10-

battery, i.e., by willfully and intentionally grabbing and jerking JG's head back quite aggressively against his will.

Defendants contend that the Paul D. Coverdell Teacher Protection Act of 2001, 20 USC §§ 7941 to 7948, provides Turbiak with immunity against plaintiff's assault and battery claim. However, defendants have not established that this federal legislation even applies to preempt Michigan civil claims, and no caselaw, either state or federal, supports their contention. Furthermore, the protections of the Act do not insulate school employees from willful misconduct, gross negligence, or reckless misconduct, nor are they available where a teacher's actions are not carried out in conformity with state laws. See 20 USC §7946. For these reasons, and in light of our determination that, viewed in the light most favorable to plaintiff, the record raises a factual issue regarding whether Turbiak acted in good faith and without malice, we conclude that Turbiak has not met her burden to prove entitlement to the protections of the Act. Accordingly, the trial court did not err in denying defendants' motion for summary disposition of plaintiff's claim against Turbiak for assault and battery.

Plaintiff also alleged in Count I of the complaint that Turbiak acted with gross negligence, as well as willful and wanton misconduct. Defendants contend in their brief that "[t]hese allegations of gross negligence and/or willful and wanton misconduct were included by Plaintiff in Count I presumably only to avoid governmental immunity." Defendants contend that plaintiff has cited "no authority in the lower court for the proposition that such claims are actionable separately from the assault and battery claims." This may explain why defendants do not raise as a question presented whether the trial court erred in denying defendants' motion for summary disposition with respect to these claims. Nevertheless, we find no reason why plaintiff was not entitled to bring a gross negligence action against Turbiak.[9] See *Bellinger by Bellinger v Kram*, 319 Mich App 653; 904 NW2d 870 (2017).

" 'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). Turbiak knew that JG was a medically fragile child with hydrocephalus and a shunt and that it was important to protect the child's head because any severe head movement could have serious medical effects. In light of what Turbiak knew, and viewing the evidence in the light most favorable to plaintiff, *Dillard*, 308 Mich App at 445, a reasonable jury could find that Turbiak's alleged grabbing of JG's head and jerking it back "quite aggressively," especially when knowing that he suffered from hydrocephalus and was medically fragile, demonstrated a substantial lack of concern for whether injury resulted. Thus, to the extent defendant has raised the issue, we conclude that the trial

---

[9] With regard to plaintiff's allegation that Turbiak engaged in willful and wanton misconduct, it is unclear whether such purported cause of action even exists in the current factual setting. Because neither party has undertaken to brief the issue, the Court declines to undertake the task of its own accord. See *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (indicating the Court's disinclination to discover and rationalize the basis for a party's claims). Accordingly, we will not disturb the trial court's denial of summary disposition with respect to this allegation.

-11-

court did not err in denying Turbiak's motion for summary disposition with regard to plaintiff's claim of gross negligence.

## C. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants argue that the trial court erred in denying summary disposition to defendant Turbiak with respect to plaintiff's claim in Count IV of intentional infliction of emotional distress (IIED) because Turbiak's conduct was not extreme and outrageous, and there is no evidence JG suffered any psychological injuries, as the Sixth Circuit concluded.[10] Based on the record evidence, we agree that Turbiak was entitled to summary disposition of this claim.

> To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff. Only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community will liability attach. [*Dalley v Dykema Gossett*, 287 Mich App 296, 321; 788 NW2d 679 (2010) (quotation marks and citations omitted).]

Even if we were to assume for the sake of argument that plaintiff established the first two prongs of a prima facie case for IIED, she has not presented admissible evidence that Turbiak's conduct caused JG to suffer severe emotional distress. Quoting Restatement Torts, 2d, §46, comment j, p 77, our Supreme Court in *Roberts v Auto-Owners Ins. Co*, 422 Mich 594, 608-609; 374 NW2d 905, described "severe emotional distress" as follows:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. *It is only where it is extreme that the liability arises.* Complete emotional tranquillity [sic] is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.*"

> Further, although bodily injury need not result, the Restatement commentary suggests that "more in the way of outrage" may be required where a claim is based on emotional injury alone. *Id*., comment K, p 78.

---

[10] As noted above, the trial court dismissed Count IV with respect to the other defendants.

Defendants point to the Sixth Circuit's conclusion that there was no evidence JG suffered from either physical or psychological injury, or that any behavioral problems JG developed in the summer of 2012 could be linked to the March 5, 2012 incident. *Gohl*, 836 F3d at 679. Regardless of whether such conclusion constitutes collateral estoppel, the Sixth Circuit accurately described the record evidence. There simply is no admissible evidence to create a genuine issue of material fact as to whether JG suffered extreme emotional distress caused by the March 5, 2012 incident.

Plaintiff maintains that JG suffered severe emotional distress due to the March 5, 2012 incident as well as his witnessing the abuse of other children in the classroom. However, plaintiff's contentions are unsupported by the record. First, rather than cite to the record to establish that JG actually witnessed or was at least in the classroom when the alleged acts of abuse to other children occurred, plaintiff relies on general statements made to Moore regarding Turbiak's harsh, abrupt, and aggressive treatment of students and paints in broad, emotionally charged strokes, a picture of a classroom characterized by "systematic" abuse. In addition, plaintiff does not point to any record evidence indicating that JG suffered what a reasonable jury might conclude to be severe emotional distress.

Second, plaintiff's reliance on Gerald A. Shiener, M.D.'s "report" to support a claim for IIED is misplaced. As noted by the federal district court when entertaining defendants' motion for summary judgment, Shiener's unsworn report is hearsay. MRE 801; *Gohl*, 134 F Supp 3d at 1086 n 13. Documentary evidence offered in support of or in opposition to a motion for summary disposition "shall only be considered to the extent that the content or substance would be admissible evidence to establish or deny the grounds stated in the motion." MCR 2.116(G)(6). Because the content of Shiener's report is inadmissible hearsay, it cannot be considered in support of plaintiff's allegation.

Even if Shiener's report could be considered, his expert opinion is conclusory, unsubstantiated, and based on facts contrary to the record. The essence of Shiener's opinion is that JG's behavioral changes starting in the summer of 2012 are attributable to changes in his brain brought about by Turbiak's physical abuse of JG and the emotional trauma JG suffered watching Turbiak abuse other children. Shiener based his opinion in part on information that Turbiak was "grabbing [JG's] head, shaking his head, jerking his head, and twisting his head." Shiener opined that the "kind of behaviors described would have an extremely negative effect and damaging effect on brain tissue." However, nowhere in the record is there any evidence that Turbiak shook or twisted JG's head. Shiener also appears to have based his opinion on an understanding that JG's behavioral changes began in March 2012, shortly after the alleged head-grabbing incident. However, plaintiff testified that JG's behavioral changes did not begin until the summer of 2012, after she removed him from Webster and months after the March 5, 2012 incident. With regard to Shiener's opinion that JG's behavioral changes arose from changes in JG's brain attributable to Turbiak's conduct, Shiener provides no evidence of any changes in JG's brain, nor is there any evidence that Shiener conducted testing to determine whether such changes actually occurred. In light of the inadmissibility of Shiener's opinion, the unsupported facts upon which he based his opinion, and the lack of any facts or medical data supporting his expert opinion, the content of Shiener's report does not support plaintiff's assertion that JG suffered severe emotional distress arising from any of the complained-of conduct of Turbiak.

Because plaintiff has failed to create a genuine issue of material fact as to whether JG suffered severe emotional distress due to Turbiak's conduct, we conclude that the trial court erred in denying defendants' motion for summary disposition of the IIED claim against Turbiak.

## D. FAILURE TO REPORT SUSPECTED CHILD ABUSE OR NEGLECT

Defendants claim that the trial court erred in not granting their motion for summary disposition of plaintiff's allegations in Count II of failure to report suspected child abuse or neglect in violation of MCL 722.623. We agree.

This Court reviews questions of statutory interpretation and application de novo. *Farmers Ins Exch v AAA of Mich*, 256 Mich App 691, 694; 671 NW2d 89 (2003). The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *Mich Ed Ass'n v Secretary of State* (*On Rehearing*), 489 Mich 194, 217; 801 NW2d 35 (2011). Provisions must be read in the context of the entire statute to produce a harmonious whole. *CG Automation & Fixture, Inc v Autoform, Inc*, 291 Mich App 333, 338; 804 NW2d 781 (2011).

The purpose of the child protection law (CPL) "is to protect abused and neglected children." *Becker-Witt v Bd of Examiners of Social Workers*, 256 Mich App 359, 364; 663 NW2d 514 (2003). The CPL focuses on protecting children in situations "where abuse and neglect frequently go unreported, i.e., when perpetrated by family members or others with control over the child." *People v Beardsley*, 263 Mich App 408, 413; 688 NW2d 304 (2004); MCL 722.623. "Child abuse," as used in the CPL,

> means harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy." MCL 722.622(g).

To achieve the purpose of the CPL, MCL 722.623(1)(a) imposes a duty on certain people to report suspected child abuse or neglect immediately to the proper state authority. Those with a statutory duty to report include anyone who is a "social worker, licensed master's social worker . . . school administrator, school counselor or teacher[.]" MCL 722.624 permits non-mandatory reporters who have "reasonable cause to suspect child abuse or neglect" to "report the matter to the department [of health and human services (DHHS)] or a law enforcement agency." Mandatory and non-mandatory reporters who report in good faith, "cooperate[] in an investigation, or assist[] in any other requirement of [the CPL] [are] immune from civil or criminal liability that might otherwise be incurred by that action." MCL 722.625. A mandatory reporter who fails to report suspected child abuse or neglect as required by the CPL "is civilly liable for the damages proximately caused by the failure." MCL 722.633(1).

Occupational therapists DeBeaudry and Crews, speech pathologist Sokol, and paraprofessionals Respondek and Sprow are entitled to summary disposition of plaintiff's failure-to-report claim because they are not mandatory reporters under MCL 722.623. Plaintiff urges the Court to interpret the statute broadly enough to include these defendants because doing

so would serve the Legislature's intended purpose and because these defendants exercise roles "essentially identical to that of a teacher." We decline to interpret the statutory language beyond its plain meaning.

Reading the provisions of the CPL as a whole, *CG Automation & Fixture, Inc*, 291 Mich App at 338, indicates that the Legislature intended to identify and limit those upon whom it imposed a duty to report. The list of professions in MCL 722.623 clearly informs people in those professions of their statutory duty to report suspected child abuse and neglect, regardless of where they encounter such abuse. Plaintiff's proposition that courts should impose liability on one whose job title may not be identified in MCL 722.623(1)(a), but whose function in a particular setting is similar to that of an identified mandatory reporter, substitutes vagueness for clarity and has the potential to substantially increase the ranks of mandatory reporters. Neither result comports with the Legislator's clearly expressed intent to limit mandatory reporters to a clearly defined group of professionals. This Court has resisted arguments to expand the reporting requirements beyond those clearly delineated by the Legislature. See *Beardsley*, 263 Mich App at 414, 416 (declining to expand reportable contact to include sexual contact between two minor students). Accordingly, we decline to expand the meaning of "teachers" to include paraprofessionals and ancillary service staff, and conclude that the trial court should have dismissed plaintiff's failure-to-report allegations against DeBeaudry, Crews, Sokol, Sprow, and Respondek because they are not mandatory reporters under MCL 722.623.

Defendants also argue that mandatory reporters Liepa, Moore, and Sloboda are entitled to summary disposition based on governmental immunity. We agree. As previously stated, the applicability of governmental immunity is a question of law that this Court reviews de novo. *Co Rd Ass'n of Mich*, 287 Mich App at 117-118.

According to this Court's binding precedent, the mandatory reporting provisions of MCL 722.623 do not nullify the governmental immunity statute, MCL 691.1407. *Jones v Bitner*, 300 Mich App 65, 68; 832 NW2d 426 (2013). Thus, as superintendent of LPS, Liepa is entitled to executive immunity pursuant to MCL 691.1407(5). *Nalepa v Plymouth-Canton Community Sch*, 207 Mich App 580, 587; 525 NW2d 897 (1992) (establishing that executive immunity applies to a school superintendent). MCL 691.1407(5) provides in relevant part that "the elective or highest appointive executive official of all levels of government" is immune from tort liability for injuries to persons "if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Plaintiff does not contend that Liepa was not acting within the scope of his authority during all times relevant to these proceedings. Therefore, the trial court erred by not granting Liepa summary disposition of plaintiff's failure-to-report claim pursuant to MCR 2.116(C)(7).

Moore and Sloboda are also entitled to summary disposition of plaintiff's failure-to-report allegations based on governmental immunity. "As with all other mandated reports, the failure to report when required to do so is judged under an ordinary negligence standard." *Lee v Detroit Med Ctr*, 285 Mich App 51, 70; 775 NW2d 326 (2009). Governmental employees are immune from negligent tort liability if while in the course of employment they were acting or reasonably believed they were acting within the scope of their authority, they were engaged in the discharge of a governmental function, and they did not act with gross negligence that is the

-15-

proximate cause of the alleged injury or damage. MCL 691.1407(2); see also *Odom*, 482 Mich at 470, 479-480.

Plaintiff argues that Moore and Sloboda are not entitled to governmental immunity because they were not, or could not reasonably believe that they were, acting within the scope of their authority when they failed to report Turbiak's alleged child abuse to the proper state authority. This argument lacks merit. Plaintiff acknowledges that Michigan law and LPS policy authorized Moore and Sloboda to report Turbiak's allegedly abusive conduct. Moore reported the results of her investigation to DeMan, and Sloboda reported what she saw on March 5, 2012, to Moore. We hold that by reporting, both women were acting within the scope of their authority. That they did not report Turbiak's alleged abuse to the proper authorities pursuant to MCL 722.623 may give rise to a presumption of negligence, but it does not mean that they were acting outside the scope of their authority. See *Backus*, 238 Mich App at 410.

Plaintiff also argues that Moore and Sloboda are not entitled to governmental immunity because their conduct constituted gross negligence. "[W]hether a governmental employee's conduct constituted gross negligence under MCL 691.1407 is generally a question of fact." *Id.* at 88. However, "a court may grant summary disposition under MCR 2.116(C)(7) " 'if, on the basis of the evidence presented, reasonable minds could not differ . . . .' " *Id.*, quoting *Jackson v Saginaw Co*, 458 Mich 141, 146; 580 NW2d 870 (1998).

Even if we assume for the sake of argument that Moore and Sloboda should have reported suspected child abuse to the proper state authority rather than simply handling their concerns internally, the actions they did take do not present sufficient indicia of gross negligence to create a genuine issue of material fact for a jury to decide. See *Maiden v Rozwood*, 461 Mich at 122-23 ("[E]vidence of ordinary negligence does not create a material question of fact concerning gross negligence."). The record shows that in the fall of 2011, Moore investigated complaints about Turbiak's treatment of staff and students, sought guidance from DeMan, counseled Turbiak, and subsequently monitored her classroom. With regard to the March 5, 2012 incident, Sloboda immediately reported the incident to Moore and, at Moore's request, followed up her verbal account with a written statement. Moore informed and sought guidance from several people in the central office, after which she returned to and remained in Turbiak's classroom until she could escort Turbiak to her office in order to investigate what occurred and determine whether it rose to the level of child abuse or neglect. Turbiak explained her conduct, which had a ring of truth to Moore, as she knew JG had a habit of throwing his head back, requiring measures to protect him from hurting himself, and there had even been talk about placing him in a soft helmet to protect him from his own conduct. There is no evidence that Turbiak ever laid hands on JG again or otherwise mistreated another child in his presence. On this record, an objective observer could not reasonably conclude that the conduct of Moore and Sloboda was "so reckless as to demonstrate a substantial lack of concern for whether an injury results," MCL 691.1407(8)(a), or that they "simply did not care about the safety or welfare of those in [their] charge," *Tarlea*, 263 Mich App at 90.

Defendants Moore and Sloboda have established that they were acting within the scope of their authority and without gross negligence. Given that plaintiff has not contested that they were acting in the course of their employment and their acts were discretionary, Moore and Sloboda are entitled to governmental immunity. *Tarlea*, 263 Mich App at 89 ("governmental

employees acting within the course of their employment and the scope of their authority are immune from tort liability except in cases where their actions constitute gross negligence."). We need not address whether their actions were the proximate cause of JG's alleged injuries. For these reasons, the trial court erred in not granting to Moore and Sloboda summary disposition of plaintiff's failure-to-report allegations pursuant to MCR 2.116(C)(7).

Finally, Turbiak contends that the trial court erred in not only interpreting plaintiff's allegations regarding failure to report child abuse in Count II as including her, but then refusing to grant her summary disposition when the matter was raised at the hearing of defendant's motion for summary disposition. Defendants argue that the Legislature could not have intended that the potential perpetrators of child abuse, who are mandatory reporters themselves, must report themselves to the DHHS or a law enforcement agency when they have reasonable cause to suspect that they may have abused a child. Plaintiff contends that she meant to include Turbiak among those liable in Count II, and that under the plain language of MCL 722.623, Turbiak is liable for failing to report herself to the proper authority. Defendants' arguments have merit.

The heading in plaintiff's complaint for Count II states: "Violation of MCL 722.623 – Failure to Report Child Abuse – All Defendants." But in its numbered paragraph allegations, plaintiff specifically alleges, "Liepa, Moore, Respondek, Sprow, DeBeaudry, Sokol, DeMan, Crews, and/or Sloboda, knew of Turbiak's abuse of children before, during and after her abuse of [JG]," and that "Liepa, Moore, Respondek, Sprow, DeBeaudry, Sokol, DeMan, Crews, and/or Sloboda failed to submit an oral report to CPS in direct contravention of MCL 722.623." Further, plaintiff states, "[a]s a or the direct and proximate cause of the statutory violations, Turbiak was enabled to continue her abusive behavior . . . ." Plaintiff did not include Turbiak in any of the allegations as failing to report herself. At the hearing of defendants' motion for summary disposition, one of plaintiff's attorneys asserted that they had intended Count II to include Turbiak. However, by intending to plead the count against Turbiak without actually specifying her in any of the allegations, plaintiff arguably failed to fulfill the primary function of pleading in Michigan, which "is to give notice of the nature of the claim or defense sufficient to permit the opposite party to take a responsive position." *Dalley*, 287 Mich App at 305; MCR 2.111(B)(1). At the very least, plaintiff's complaint is ambiguous. A heading, although it conveys the nature of the claim, is not an allegation to which a defendant is required to respond. MCR 2.111(C). Nowhere in plaintiff's complaint did plaintiff specifically allege that Turbiak was liable for violating MCL 722.623 by failing to report her own conduct, and thus, defendants were not required to respond to such a claim.

No Michigan authority has addressed whether a perpetrator who also happens to be a mandatory reporter is obligated to report his or her conduct under MCL 722.623, and the CPL is silent on the issue. The only known authority addressing the question is *Craig v Lima City Schs Bd of Ed*, 384 F Supp 2d 1136, 1150-1151 (ND Ohio, 2005), which concluded, "it is a ridiculous proposition that an abuser would report himself." Although we are not bound by the federal district court's decision, it is persuasive. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004). The CPL's focus on protecting children in situations where abuse and neglect frequently go unreported, *Beardsley*, 263 Mich App at 413, as when the perpetrator is a parent, a legal guardian, a teacher, a teacher's aide, or a member of the clergy, MCL 722.622(g), reasonably suggests that the Legislature's operative assumption was not that perpetrators would report themselves. Nevertheless, we need not reach the issue of statutory interpretation because

plaintiff did not plead her failure-to-report claim against Turbiak with sufficient specificity to put her on notice that plaintiff meant to include her in the allegations. Consequently, the trial court erred in ordering that Count II included a claim against Turbiak and denying Turbiak summary disposition of such claim. MCR 2.116(C)(8).

## E. GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT

Defendants Liepa, Moore, Respondek, Sprow, DeBeaudry, Sokol, DeMan, Crews, and Sloboda contend that the trial court erred in denying their motion for summary disposition with respect to plaintiff's allegations against them in Count III for gross negligence and willful and wanton misconduct. They claim that governmental immunity applies to bar such claims, as no reasonable jury would conclude that their conduct rose to the level of gross negligence or willful and wanton misconduct. In light of the record evidence, we agree.[11]

We turn first to plaintiff's allegation of willful and wanton misconduct. Even if we assume that such a cause of action exists in these circumstances (see note 9), and without consideration of governmental immunity, plaintiff has not presented evidence sufficient to raise a material question of fact regarding whether the conduct of these defendants showed "an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Burnett v City of Adrian*, 414 Mich 448, 455; 326 NW2d 810 (1982).

As to plaintiff's allegations of gross negligence, we explained elsewhere in this opinion that Liepa is immune from tort liability because he was acting within the scope of his executive authority. In addition, Moore and Sloboda are entitled to governmental immunity because plaintiff failed to raise a genuine issue of material fact that they acted outside the scope of their authority or with gross negligence. MCL 691.1407(2); *Tarlea*, 263 Mich App at 89.

Plaintiff argues that Respondek, Sprow, DeBeaudry, Sokol, and Crews are not entitled to governmental immunity because they were not, or could not reasonably believe that they were, acting within the scope of their authority when they failed to act on their knowledge of Turbiak's alleged abuse of the students in her classroom, and that this failure constituted gross negligence.

Plaintiff grossly mischaracterizes the conduct of Crews, Sprow, Sokol, and DeBeaudry. The record shows that these defendants did not simply discuss their concerns about Turbiak's conduct among themselves and do nothing.[12] They shared their concerns about Turbiak's behavior toward staff and students with Program Specialist Santer and with Moore in October 2011. Their reports were the catalyst for events that eventually lead to DeMan's warning letter to Turbiak and that, according to multiple deponents, ushered in a period of improved conditions. Whatever else these defendants could have done or might have done, they were operating within

---

[11] Defendants also contend that because Turbiak was not grossly negligent, they cannot possibly be deemed grossly negligent; however, we need not address this argument given our conclusion based on the record evidence concerning their own conduct.

[12] As already discussed, none of these defendants were mandatory reporters under the CPL.

their scope of authority when considering whether and to whom to relay their concerns, and an objective observer could not reasonably conclude that these defendants "simply did not care about the safety or welfare of [the children] in [their] charge." *Tarlea*, 263 Mich App at 90; see also *Maiden*, 461 Mich at 122-123 ("[E]vidence of ordinary negligence does not create a material question of fact concerning gross negligence."). Accordingly, Crews, Sprow, Sokol, and DeBeaudry are entitled to protection from tort liability based on governmental immunity and, therefore, to summary disposition of plaintiff's claims of gross negligence.

Respondek does not appear to have been among those voicing concerns about Turbiak to Santer and Moore.[13] However, plaintiff has presented scant evidence regarding Respondek's conduct prior to the March 5, 2012, incident that gave rise to this action, and has failed to present any evidence indicating that her conduct relative to JG constituted gross negligence. There is no evidence that Respondek mistreated JG or witnessed the March 5, 2012, incident in question involving Turbiak, other than to observe the alleged aftermath, which Respondek described as JG laughing when Turbiak removed him from his chair, after which he picked up the rings, and then started giggling when Turbiak returned him to his chair. Simply put, the record evidence does not create a genuine issue of material fact as to whether Respondek was grossly negligent in any way with respect to JG.

In light of the foregoing, we conclude that the trial court erred by denying defendants' motion for summary disposition of plaintiff's claims under Count III of her complaint pursuant to MCR 2.116(C)(7). There is no genuine issue of material fact as to whether anyone's conduct but Turbiak's rose to the level of gross negigence.[14]

### III. CONCLUSION

We affirm the trial court's order denying summary disposition to Turbiak with respect to Count I (assault and battery; gross negligence; willful and wanton misconduct).

We reverse the trial court's order denying summary disposition to defendants with respect to Counts II (failure to report) and III (gross negligence and willful and wanton misconduct). Liepa is entitled to executive immunity as to both counts pursuant to MCL 691.1407(5). With regard to Count II, Respondek, Sprow, DeBeaudry, Sokol, and Crews were not mandatory reporters, and are thus entitled to summary disposition pursuant to MCR 2.116(C)(8), Moore and Sloboda are entitled to governmental immunity, MCR 2.116 (C)(7), and plaintiff did not specifically include Turbiak in Count II of her complaint, MCR 2.116 (C)(8). With regard to Count III, defendants are entitled to governmental immunity, MCR 2.116(C)(7),

---

[13] A significant motivating factor for the reports made to Moore by Crews, Sprow, and, especially, Sokol, were concerns about Turbiak's treatment of those providing ancillary services. Respondek, a paraprofessional in Turbiak's class, does not appear to have been a target of Turbiak's ill treatment.

[14] Plaintiff's claims of gross negligence and willful and wanton misconduct by Turbiak were raised in Count I, not Count III, so dismissal of Count III is appropriate.

as to plaintiff's allegations of gross negligence. As to willful and wanton misconduct, defendants are entitled to summary disposition pursuant to MCR 2.116(C)(10) because plaintiff has failed to present evidence supporting her allegations that their conduct showed an intent to harm or indifference that amounted to a willingness that harm occur.

We reverse the trial court's order denying summary disposition to Turbiak with respect to Count IV pursuant to MCR 2.116(C)(10) because plaintiff failed to present any admissible evidence raising a material question of fact as to whether JG suffered severe emotional distress.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Mark T. Boonstra
/s/ Jane M. Beckering
/s/ Amy Ronayne Krause