SUTTON, J., delivered the opinion of the court in which BOGGS, J., joined. CLAY, J. (pp. 685-98), delivered a separate dissenting opinion.
OPINION
SUTTON, Circuit Judge.
Sharon Turbiak, a twelve-year special education veteran, taught a preschool class that required sensitivity to mentally and physically disabled children. The allegations contained in this lawsuit, filed by the mother of one of her students, suggest she had considerable trouble on that score, as do the school district’s actions in firing her. The question at hand is whether her conduct also violated the United States Constitution, two federal statutes (the Americans with Disabilities Act and the Rehabilitation Act), and Michigan law. Because Gohl did not provide sufficient evidence from which a reasonable jury could find in her favor, as the district court concluded in a thorough 39-page opinion granting summary judgment to the defendants, we affirm.
I.
J.G. was born with hydrocephalus, a disorder that causes an unsafe buildup of fluid in the brain. He underwent numerous surgeries to correct or ameliorate the condition. At age three, his mother, Lauren Gohl, enrolled him in the morning session of the Moderate Cognitive Impairment Program at Webster Elementary School, which offered educational and therapeutic services for students like him. His teacher was Sharon Turbiak, a long-time special education teacher.
During the school year, Turbiak faced several complaints about her teaching (and her relationship with her colleagues) and *677 one complaint about her teaching of J.G. In October 2011, a special-needs specialist approached the principal at Webster, Shel-lie Moore, and passed along some concerns from other staff members about Turbiak’s classroom behavior. Moore looked into the issue and over the next few days cata-logued concerns about Turbiak. According to Moore, an occupational therapist reported that Turbiak’s class was “a very uncomfortable place to work” and that some on Turbiak’s team thought she was overly “harsh with [the] children, holding their faces or chins tightly and yelling in their faces.” R. 184-9 at 2. A speech pathologist thought that Turbiak “used too much force by pushing on children’s shoulders,” and that the “lower functioning children in the classroom were frustrating to Ms. Turbiak and ... were most vulnerable to possible rough treatment.” Id. A paraprofessional called Moore in tears, worrying that Turb-iak’s bad behavior was “escalating.” Id. An occupational therapist said that Turbiak was “gruff and abrupt”; that Turbiak once force-fed a gagging and crying student; and that Turbiak “picked up [children] from the floor by one arm and that there was the potential to dislocate a small shoulder.” Id. Not one of these incidents, the parties agree, involved J.G.
On the advice of Cynthia DeMan, the Director of Personnel for Livonia Public Schools, Moore met with Turbiak to discuss ' her teaching. During the meeting, Turbiak admitted that she was “feeling unappreciated at Webster” and that she was “stressed out because of the level of disability of her students and the reduction of support.” Id. at 8. Turbiak also explained that she was not as “touchy feely” as her co-workers, had high expectations for her students, and “wanted them to make gains while in her classroom.” Id. The next morning, even though Moore told Turbiak not to question the members of her team, Turbiak called a meeting to find out who had complained to the administration. This did not help matters. Members of Turbiak’s team went to Moore again, telling her about the meeting and adding that they feared retaliation.
The next day, November 2, 2011, Turb-iak and her union representative met with DeMan. The meeting focused on Turbiak’s strained relations with her colleagues rather than on mistreatment of students. De-Man sent Turbiak home for a few days and followed up with a consultation letter, which explained, at heart, that, if Turbiak was not more professional with staff and students, she would be subject to disciplinary action. The letter urged Turbiak to follow “best practices” and to avoid “lapsing] into inappropriate behaviors with either staff or students.” R. 128-8 at 2. But the letter did not specifically accuse Turbiak of abusing students.
The meeting hélped. For four months, no one reported any mistreatment of students by Turbiak or complained about friction between her and other employees.
The peace ended on March 5, 2012, when a social worker, Diane Sloboda, saw Turbiak “grab [J.G.] by the top of his head and jerk it back quite aggressively. She also yelled “You need to listen’ very close to his face.” R. 123-9 at 2. Sloboda told Principal Moore about the incident. Moore called the central office and was instructed to send Turbiak over that afternoon. Turb-iak and her union representative met with DeMan and Dorothy Chomicz, a director of human resources. Turbiak denied any “grab[bing]” or “yellpng].” R. 179-6 at 21. She said she was using a special education technique called “redirecting” to focus and hold J.G.’s attention after he threw a ring-stacking toy. Id. Consistent with this technique, she said she put her hand on the back of J.G.’s head “to keep [it] from bouncing around,” — a problem for J.G.— and “[s]poke directly” to him. R. 179-6 at 21. Chomicz, trained as a special education *678 teacher and familiar with this technique, thought this sounded reasonable and sent Turbiak back to her classroom.
Later in March, one of Turbiak’s paraprofessionals, Nancy Respondek, was accused of spanking a student (not J.G.), after which the school investigated the incident and whether Turbiak was behaving “in accordance with [the] guidelines” set forth in DeMan’s November consultation letter. R. 123-12 at 2. After the investigation, the district placed Turbiak and Res-pondek on administrative leave.
Gohl filed this lawsuit on J.G.’s behalf, alleging that Livonia Public Schools, Turb-iak, Respondek, Moore, and other members of the school system violated J.G.’s rights under federal and state law. The district court granted summary judgment for the defendants on Gohl’s federal claims and declined to exercise supplemental jurisdiction over the state law claims.
II.
On appeal, Gohl claims the district court should have allowed four sets of her claims to go to a jury: (1) the substantive due process claim against Turbiak; (2) the Americans with Disabilities Act and Rehabilitation Act claims against Livonia Public Schools; (3) the equal protection claims against all defendants; and (4) all of the claims involving municipal liability for Livonia Public Schools.
Our standard of review is not new. We construe the record in Gohl’s favor. T.S. ex rel. J.S. v. Doe, 742 F.3d 632, 635 (6th Cir. 2014). To fend off summary judgment, Gohl must present evidence that would permit a reasonable jury to find in J.G.’s favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
(1) Substantive due process claim. Gohl maintains that Turbiak violated J.G.’s right to be “free from excessive force under the [Fourteenth] Amendment.” Appellant’s Br. 28. She premises the argument on two types of alleged abuse: the March 5 head-grabbing incident and exposure to a psychologically abusive teacher. We address each one separately.
The Due Process Clause of the Fourteenth Amendment protects individuals from the arbitrary actions of government employees, but “only the most egregious official conduct can be said to be arbitrary in the constitutional sense.” Cty. of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quotation omitted). The question is “whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking the conscience.” Webb v. McCullough, 828 F.2d 1151, 1158 (6th Cir. 1987) (quoting Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980)); see Domingo v. Kowalski, 810 F.3d 403, 411 (6th Cir. 2016).
Physical abuse. We recently applied the “shocks the conscience” test to allegations just like Gohl’s. In Domingo, the parents of disabled students challenged a similar use of physical force — a special education teacher’s use of the redirection technique that Turbiak used on March 5 with J.G. 810 F.3d at 408 (explaining that the teacher was “grabbing the 'student’s face, squeezing his or her cheeks, and pointing the student’s face toward” her). In rejecting the parents’ claim, we adopted the Third Circuit’s “useful, though not necessarily exhaustive” analysis of the “shocks the conscience” standard in public schools, asking four guiding questions: (1) ‘Was there a pedagogical justification for the use of force?” (2) “Was the force utilized excessive to meet the legitimate objective in this situation?” (3) “Was the force ap *679 plied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?” And (4) “Was there a serious injury?” Id. at 411 (quoting Gottlieb v. Laurel Highlands Sch. Dist., 272 F.3d 168, 173 (3d Cir. 2001)). Just as these factors precluded relief as a matter of law in Domingo, they preclude relief here.
As to the first consideration — pedagogical justification — Turbiak had one. Un-rebutted testimony reflects that Turbiak used an established special education technique, “redirection,” to make J.G. pick up a ring-stacking toy he had knocked off a table. Turbiak said so in her meeting with DeMan and Chomicz immediately after the incident. She said so again in her deposition. And Gohl offers no evidence to refute the claim. Requiring a child to clean up a mess he made not only fits with a commonsense understanding of what teachers typically do, but it also fits with the demands of J.G.’s Individualized Education Program — as provided under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400. Whatever one thinks about the timing or manner in which Turbiak used this technique here, no one can credibly deny that Turbiak had a pedagogical purpose in using it.
As to the second factor — excessiveness — we agree with Gohl that a reasonable jury could conclude that Turbiak used more force than needed. Turbiak’s action bothered Sloboda, the only adult witness, enough for Sloboda to report it to the principal. Turbiak denies that she “grabbed” or “yelled,” but in a she-said/ she-said dispute at summary judgment, our standard of review settles the issue. We view the evidence in the light most favorable to Gohl and thus must accept Sloboda’s version of events.
Even then, nothing about that account helps Gohl demonstrate that Turbiak wasn’t making “a good-faith effort to maintain or restore discipline” — the third factor. This record does not permit a jury to find that Turbiak was acting “maliciously and sadistically for the very purpose of causing harm.” She used an established technique to achieve a legitimate pedagogical goal, and, according to Turbiak’s unre-butted testimony, she achieved it. J.G. “willingly picked up the ring stackers” after being redirected. R. 184-10 at 260.
The last question is whether there was a “serious injury.” There was not. Sloboda said she saw Turbiak “letting [J.G.’s] head go. [J.G.] did not appear to be in distress. He gave no scream or cry. When his head returned back down he did not indicate that he was in any — in pain or in discomfort.” R. 184-8 at 32. Nor did any physical injury ever show up. True, in Domingo we refused to endorse a “bright-line rule” requiring evidence of physical, rather than psychological, injury. 810 F.3d at 415. To that end, Gohl, in her deposition testimony, implied that J.G. was psychologically harmed by the head-grabbing incident. But Gohl testified that J.G.’s psychological symptoms began only after he left school for the summer, and there is no evidence in the record suggesting that Turbiak’s actions would have caused psychological symptoms with such a delayed onset.
That leaves just one of the four factors favoring Gohl. No doubt this is not a counting exercise, and at any rate the list of factors is not exhaustive. All of this makes comparisons to similar cases helpful — perhaps most helpful. Domingo awarded summary judgment to a special education teacher accused of acts ranging from too-forceful “redirection” of her students to gagging a student and binding him to a gurney. Judge Boggs dissented in part, arguing that the binding and gagging incident presented a genuine issue for a jury. Domingo, 810 F.3d at 417 (Boggs, J., dissenting). But he agreed — the court was *680 unanimous on this point — ’that under the circumstances “grabbing [a] student’s face, squeezing his or her cheeks, and pointing the student’s face” could not have shocked the conscience. Id. at 408 (majority opinion). The head-grabbing incident here mirrors the head-grabbing incident in Domingo and involves far less illegitimate force than the act of binding a student to a gurney and gagging him. What was true in Domingo is true here. While Turbiak’s “educational and disciplinary methods ... may have been inappropriate” and “insensitive,” they are not “unconstitutional.” Id. at 416.
The March 5 head-grabbing also is less severe than the incident in Lillard v. Shelby County Board of Education, where we affirmed summary judgment in favor of a teacher who slapped a student without a legitimate pedagogical goal. 76 F.3d 716 (6th Cir. 1996). That episode didn’t shock the conscience as a matter of law. Neither did this one.
Webb v. McCullough, 828 F.2d 1151, 1159 (6th Cir. 1987), does not lead to a contrary conclusion. In the midst of a class trip to Hawaii, a student locked herself in a hotel bathroom after being told she’d be sent home for drinking, breaking curfew, and having a boy in her room. Her angry chaperone burst through the bathroom door, which struck the student and knocked her to the floor, after which he “grabbed [her] from the floor, threw her against the wall, and slapped her.” Id. at 1154. Because “the record d[id] not demonstrate that the alleged blows . ’.. were in any way disciplinary,” id. at 1158, those' acts were malicious in a way that forceful “redirecting” surely is not. The district court correctly rejected this claim.
Psychological abuse. Gohl also insists that J.G. was psychologically injured by Turbiak’s bullying of other students, even if not by the March 5 incident directed at J.G. We disagree for two reasons.
First, Gohl has not presented enough evidence for a reasonable jury to conclude that J.G. was injured at all. The only expert authority in support of Gohl’s psychological injury theory is the report from Dr. Sharon Hall, which says that behavior like Turbiak’s “may” cause students to be psychologically harmed. R. 206-12 at 27-28. But that expert, who is not a psychologist, never examined J.G. And that expert never opined that the possibility of psychological injury (“may” cause an injury) became a reality here (did cause an injury). The only evidence of any effect on J.G. is Gohl’s testimony that, starting in the summer after J.G. left Webster Elementary, J.G. began to exhibit “anxiety, opening and closing anything and everything, having things done a certain way or panic, panic.... And still, to this day, he grabs my face to get my attention.... [I]t’s a daily thing.” R. 209-5 at 20-21. That evidence does not suffice for a reasonable jury to find a psychological injury at all, much less a serious injury traceable to Turbiak.
Second, the novelty of Gohl’s theory of injury means that she cannot overcome Turbiak’s qualified immunity. Government employees are generally shielded from civil liability unless their conduct violates a clearly established constitutional right such that a reasonable official would have known that his conduct was unlawful. Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). The Fourteenth Amendment’s right to be free from excessive force may include, we have said, protection from physical force that causes only psychological injury. Domingo, 810 F.3d at 415-16. But we have never said that purely psychological bullying can suffice to shock the conscience. And we certainly have not said so with clarity that “place[s] the ... constitutional question beyond debate.” al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074. That necessarily means *681 that the right Gohl asserts is not clearly-established, making Turbiak eligible for qualified immunity.
(2) Americans with Disabilities Act and Rehabilitation Act claims. The Americans with Disabilities Act and the Rehabilitation Act combat discrimination against disabled individuals. Title II of the Americans with Disabilities Act provides that “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act provides that a qualified individual with a disability shall not, “solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.” 29 U.S.C. § .794(a). Each Act allows disabled individuals to sue certain entities, like school districts, that exclude them from participation in, deny them benefits of, or discriminate against them in a program because of their disability. Anderson v. City of Blue Ash, 798 F.3d 338, 357 (6th Cir. 2015); cf. G.C. v. Owensboro Pub. Sch., 711 F.3d 623, 635 (6th Cir. 2013).
Gohl’s statutory claims fail for two reasons. She has not provided enough evidence for a reasonable jury to find that J.G. was denied participation in or a benefit of his education program, and she has failed to show that any of the challenged actions occurred “because of’ or “solely by reason of’ J.G.’s disability.
Denial of benefits. Gohl has plenty of evidence that Turbiak was a bad, perhaps even abusive, teacher when it came to other students. But she has not provided any evidence indicating that Turbiak’s failure to meet the ideals of her profession translated into a denial of any educational benefit to J.G.
Gohl tried to present three types of evidence below on this score. The district court refused to consider one of them, a report by psychologist Dr. Gerald Shiener, because it was unsworn and thus w,as inadmissible hearsay. We cannot consider it because a jury couldn’t consider it either. See Sigler v. Am. Honda Motor Co., 532 F.3d 469, 481 (6th Cir. 2008). Gohl does not dispute the point.
That leaves the Hall report and Gohl’s deposition -testimony. Hall based her report exclusively on a report by a school investigator, not on any individual assessment of J.G., and the report at any rate asserts only that Turbiak’s alleged behavior “may” cause students like J.G. to be psychologically harmed. R. 206-12 at 27-28. Hall does not say that J.G. himself was harmed, and neither we nor a jury can infer injury from the mere possibility of injury. Nor does Gohl’s testimony about her son’s behavior suffice to establish the denial of an educational benefit. Gohl testified that J.G. began to exhibit “[ajnxiety” and even “panic” starting in the summer after he left Webster Elementary. R. 209-5 at 20. Gohl is of course qualified to testify about changes in her son’s behavior. But she lacks the information to establish that those changes are evidence of injury in the classroom, or the qualifications to establish that the behavioral changes she identifies are evidence of harm at all, rather than cognitive development.
Supporting this conclusion is the considerable evidence that J.G. made exactly the progress during the year that his mother, his therapists, and school administrators hoped he would make. Like many disabled students, J.G. had an “individualized education program” built and honed by his mother, teachers, therapists, specialists, and administrators. See Winkelman ex rel. *682 Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 519, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007). These programs require regular meetings and regular progress reports. See 20 U.S.C. § 1414(d). His progress reports indicated that J.G. “made nice gains in imitation,” showed increased “willingness to participate,” lengthened his “attention span,” and “show[ed] new skills on a daily basis.” R. 127-10 at 2-3; R. 127-9 at 2. “[His] behavior [] improved tremendously,” and he grew “leaps and bounds with his overall demeanor.” R. 127-10 at 3.
Gohl does not dispute that progress. She claims only that he would have progressed further if he had been in a more nurturing classroom. Appellant’s Br. 25. But there’s too little evidence to back up that speculation. There is scant evidence, as shown, of psychological harm to J.G. And nothing in the progress reports suggests that his development was less than it should have been given his disability. Without any admissible testimony from a psychologist, and without any indication that J.G.’s expected progress was hampered, a reasonable jury could not find that he was discriminated against, excluded, or denied the benefits of his special education program. Were it otherwise, one might have expected Gohl to raise a claim under the most directly applicable federal statute — the Individuals with Disabilities Education Act— which guarantees J.G. a “free appropriate public education.” 20 U.S.C. § 1400(d)(1)(A). No such claim was raised.
Causation. Gohl’s claims fail for another, independent reason: she cannot meet the causation requirement. Both the Americans with Disabilities Act and the Rehabilitation Act require the challenged discrimination to occur because of disability, which is another way of saying that the plaintiff must establish a but:for relationship between the protested act and the individual’s disability. See, e.g., Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. —, 133 S.Ct. 2517, 2527-28, 186 L.Ed.2d 503 (2013); Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 314-15 (6th Cir. 2012) (en banc). The Americans with Disabilities Act requires the plaintiff to present sufficiently “significant” evidence of animus toward the disabled that is a but-for cause of the discriminatory behavior. Anderson, 798 F.3d at 357 & n.1 (quotation omitted). The Rehabilitation Act sets the higher bar, requiring plaintiffs to show that the defendant’s acts were done “solely by reason of’ the disability. G.C., 711 F.3d at 635 (emphasis added) (quotation omitted). The distinction between the two requirements is of no moment here. Either way, the record would not permit a reasonable jury to find that discrimination against J.G.’s disability was a but-for cause, much less the sole cause, of Turbiak’s conduct or the school’s response. Id.
As with many civil rights laws, the claimant may defeat a summary judgment motion through an indirect or direct showing of discrimination. See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 178, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). To proceed with 'an indirect case, Gohl must meet the requirements of the familiar McDonnell Douglas test, which we have applied to these statutes. Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1184-85 (6th Cir. 1996); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, the plaintiff must first establish a prima facie case of discrimination: that he (1) is disabled under the statutes, (2) is “otherwise qualified” for participation in the program, and (3) “is being excluded from participation in, denied the benefits of, or subjected to discrimination” because of his disability or handicap, and (4) (for the Rehabilitation Act) that the program receives federal financial assistance. G.C., 711 F.3d at 635 *683 (quotation omitted); see Monette, 90 F.3d at 1186. In an indirect case, the third factor’s causality requirement demands a showing that similarly situated non-protected students were treated more favorably. See Shah v. Gen. Elec. Co., 816 F.2d 264, 268 (6th Cir. 1987). If she satisfies those obligations, the burden shifts to the school to offer a “legitimate, nondiscriminatory” reason for its actions. Monette, 90 F.3d at 1179, 1185. If the school does so, the burden shifts back to Gohl to establish that the school’s proffered reason is merely a pretext for unlawful discrimination. Id. at 1186-87.
Gohl’s indirect case fails because she cannot meet the “requirement[ ] [that] a prima facie claim of disparate treatment” under McDonnell Douglas include evidence that a “comparable non-protected person was treated better.” Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992) (quotation omitted). As Gohl seems to acknowledge, there is no evidence in the record about how any “comparable non-protected” people were treated. See Appellant Br. 39-40. In the absence of evidence of a well-treated comparator, Gohl cannot prove that discrimination against the disabled was the reason for Turbiak’s mistreatment. See Wright v. Murray Guard, Inc., 455 F.3d 702, 709 (6th Cir. 2006). Apparently realizing that she cannot meet the standard for a prima facie case under McDonnell Douglas, Gohl does not bother to argue that the school’s defenses are pretextual.
This lack of comparators, we recognize, is no fault of Gohl’s. The circumstantial-evidence path, designed by McDonnell Douglas to make life easier for claimants in terms of establishing often-elusive evidence of discrimination, does not work well in all settings. In particular, it offers little help in the context of a claim involving a teacher who works only with individuals in a protected group, whether a teacher who works only with disabled students or a teacher who works only with students of one religious group. The comparator requirement is the be all and end all of the circumstantial-evidence test. If there are no comparators, there is no way to deploy it.
That leaves Gohl to make a direct case of discrimination. To move past summary judgment through the direct method, Gohl need not meet the comparator requirement of McDonnell Douglas. Rather, she must simply produce enough evidence of discrimination to persuade a reasonable jury that animus was a but-for cause of the challenged act. See Morgan v. SVT, LLC, 724 F.3d 990, 995 (7th Cir. 2013). The labels we might attach to evidence — “direct” or “indirect” — do not matter. Evidence counts as long as it is relevant to the purported reasonable jury’s inquiry. See Ortiz v. Werner Enters., Inc., No. 15-2574, 834 F.3d 760, 765, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016). “Evidence is evidence,” and it “must be considered as a whole.”- Id.
The record does not contain any traditional direct evidence, no smoking gun as it were, that Turbiak or other school officials intentionally mistreated disabled students because they were disabled. See Amadeo v. Zant, 486 U.S. 214, 226, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). “Direct evidence explains itself.” Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 916 (6th Cir. 2013). It “does not require the fact finder to draw any inferences to reach the conclusion that unlawful discrimination was at least a motivating factor.” Id. No such evidence exists here.
While Gohl does offer what amounts to circumstantial evidence in support of her claim, it does not indicate that disability caused the alleged abuse — when Turbiak grabbed J.G.’s head,-jerked it back, and *684 yelled at him. Her key evidence is the timeline that Moore constructed in October. It noted that “lower functioning children in the classroom were frustrating Ms. Turbiak and ... were most vulnerable to rough treatment,” and that Turbiak was “gruff and abrupt,” particularly with the “lower functioning students.” R. 184-9 at 2. It also noted that Turbiak was “feeling unappreciated at Webster” and was “stressed out because of the level of disability of her students and the reduction of support.” Id. at 3. DeMan’s counseling letter from early November acknowledged that Turbiak’s work “can be frustrating and at times possibly overwhelming.” R. 123-8 at 2.
These statements would not permit a jury to conclude that disability was a but-for cause of the head-jerking incident. Consider the context. Teaching disabled preschoolers is difficult work, and Turb-iak’s job was not made easier by the fact that she did not get along with her colleagues and had a different teaching philosophy from others on her team. Frustration and gruffness in those circumstances do not equal discrimination. Gohl’s theory also requires considerable conjecture: to suppose that Turbiak chose to become a special education teacher in order to help disabled kids, to suppose that she stood by this objective for over a decade, and to suppose that in year twelve she began discriminating against the same sorts of disabled students she had committed her career to teaching. That’s a lot of supposing. And that’s quite a conclusion. All of this stands against the possibility, experienced by most teachers at some point in their career, of getting tired of all students from time to time, as opposed to developing animus toward their physical, religious, or other characteristics. Anything can happen, we realize. And familiarity breeds all sorts of risks. But if Gohl wishes to argue to a jury that Turbiak set out to discriminate against the group she devoted a career to teaching and acted on that impulse in the head-jerking episode,' she must show more than conjecture to obtain that opportunity.
Because the record would not permit a reasonable jury to find that Livonia Public Schools excluded, denied benefits to, or discriminated against J.G. “because of’ or “solely by reason of’ his disability, Gohl’s statutory claims fail as a matter of law.
(3) Equal protection claims. Gohl’s equal protection claims fail for the same reason that her statutory claims fail: lack of evidence of discrimination. The Equal Protection Clause requires the States (and their subdivisions) to treat like people alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); see U.S. Const, amend. XIV, § 1. Disparate treatment “based on disability” violates the Equal Protection Clause if it “lack[s] a rational relationship to a legitimate governmental purpose.” Tennessee v. Lane, 541 U.S. 509, 522, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004).
In bringing this claim, Gohl assumed “the burden of showing that [the defendants] intentionally treated [J.G.] differently — because he is disabled — than similarly situated students who were like him in all relevant respects.” S.S. v. E. Ky. Univ., 532 F.3d 445, 458 (6th Cir. 2008). Gohl has not met this burden. See Marie v. Am. Red. Cross, 771 F.3d 344, 361 (6th Cir. 2014). As noted, Gohl did not provide any evidence about how similarly situated non-disabled students were treated. Nor has she pointed to evidence that could persuade a jury that any of the challenged abuse occurred because o/J.G.’s disability. Gohl’s equal protection claims thus fail for the same reasons that her Americans with Disabilities Act and Rehabilitation Act claims do.
*685 (4) Municipal liability. No one is liable for a constitutional violation that never occurred. That includes local governments. Under § 1983, municipal liability attaches “only” if “a custom, policy, or practice attributable to the municipality was the ‘moving force’ behind the violation of the plaintiffs constitutional rights.” Heyerman v. Cty. of Calhoun, 680 F.3d 642, 648 (6th Cir. 2012) (quotation omitted); see Monell v. N.Y.C. Dep’t of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But we need not examine the customs, policies, or practices of the school district if no constitutional violation occurred. See Graves v. Mahoning Cty., 821 F.3d 772, 776 (6th Cir. 2016). Because J.G.’s constitutional rights remain intact, Livonia Public Schools cannot be liable for violating them.
A few respectful words are in order in response to Judge Clay’s dissent. At this stage of a case, we must view the evidence in the light most favorable to the nonmov-ing party, not reallocate the burden of proof and not use evidence that even Gohl admits she doesn’t have.
Even Gohl acknowledges she hasn’t produced evidence of how any comparable nondisabled students were treated. See Appellant Br. 39-40. That means we cannot make assumptions about what did or did not happen “to students without disabilities.” Dissent 16. The dissent quotes liberally from Judge Boggs’s separate writing in Domingo but overlooks, first, Judge Boggs’s agreement with the majority that the use of redirection did not shock the conscience in that case, and second, the careful factual distinctions that Judge Boggs insisted on there and that we insist on here. Last, and most prominently, the dissent blurs the line between evidence of mistreatment of other students with evidence of mistreatment of J.G. (of which there was just one incident).
The appropriate standard of review in this case permits the conclusion that Turb-iak was not a good teacher — indeed a poor one. And it explains why the school district fired her. But it does not permit us to draw inferences and conclusions that the record and the law cannot support and inferences that even the plaintiff does not ask us to draw.
For these reasons, we affirm.