NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0483n.06

No. 18-2448

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GERALD S. OSTIPOW Individually and as Personal Representative of the Estate of Royetta L. Ostipow, Deceased, | ) ) ) ) | **FILED** Aug 18, 2020 DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| WILLIAM L. FEDERSPIEL; SAGINAW COUNTY SHERIFF'S DEPARTMENT; DEPUTY DOE 1–10, | ) ) ) | |
| Defendants-Appellees. | ) ) | |

**BEFORE:** **BATCHELDER, DONALD, and READLER, Circuit Judges.**

**CHAD A. READLER, Circuit Judge.**

Officers discovered marijuana plants growing in a farmhouse owned by Gerald and Royetta Ostipow. After seizing items believed to be connected to drug manufacturing, local officials initiated civil asset forfeiture proceedings against those items as well as the farmhouse itself. The Ostipows objected, claiming they were unaware their son, who lived in the farmhouse, was running a drug operation. The Ostipows then spent the next eight years in state court asserting their right to the seized property. Ultimately, they received a favorable final judgment. When the judgment was not immediately satisfied, the Ostipows turned to federal court for relief.

While we deeply sympathize with the Ostipows, their remedy continues to be in state court. As none of their federal claims are meritorious, we **AFFIRM** the judgment of the district court.

**BACKGROUND**

Gerald and Royetta purchased a farmhouse down the street from their home. To cover the approximately $150,000 purchase price, the Ostipows used a large part of their life savings and took out a $50,000 mortgage on their home. *In re Forfeiture of a Quantity of Marijuana*, No. 310106, 2013 WL 5731508, at *2 (Mich. Ct. App. Oct. 22, 2013) ("*2013 Forfeiture*").

After years of repairing and remodeling the farmhouse, the Ostipows allowed their then 36-year-old son, Steven, to move in. Steven had a history of committing minor crimes, from breaking and entering, to bar fights, to drug possession. *Id.* at *4. For a time, the support of his family seemed to help Steven alleviate those tendencies. But his path to redemption took a sharp turn when he decided to convert the majority of the farmhouse into a large marijuana-growing operation. In 2008, after receiving a tip that Steven was growing marijuana, Saginaw County Sheriff's deputies executed a warrant for the farmhouse. Officers discovered over 200 marijuana plants and fifteen pounds of processed marijuana, as well as narcotics, drug paraphernalia, and equipment used to grow marijuana. Officers seized these items as instrumentalities of crime. They also seized the farmhouse property—not just the farmhouse and its contents, but also three large sheds, which contained farm equipment, a partially restored 1965 Chevy Nova, and a snowmobile, as well as guns found in both the farmhouse and the Ostipows' home.

Following Steven's guilty plea to various drug-related crimes, the Saginaw County Prosecutor initiated civil forfeiture proceedings against the real and personal property seized. The Ostipows filed an answer in those proceedings in which they alleged they were innocent third-party owners, with no knowledge of any illegal activity. Rejecting the Ostipows' claim, the Saginaw County Circuit Court entered an order of forfeiture directing the Sheriff's Department to dispose of the property as directed by Mich. Comp. Laws § 333.7524. The Ostipows appealed.

At the same time, they moved the circuit court to stay the forfeiture order. Their motion was granted—contingent upon the Ostipows' posting a $150,000 bond. The Ostipows asked the Michigan Court of Appeals to review the bond conditions, but the appellate court denied their request. Ultimately, the Ostipows did not pay the bond. In the absence of a stay of the forfeiture order, the Sheriff's Department sold the Ostipows' property.

Two years later, the Michigan Court of Appeals determined that the Ostipows' innocent-owners defense raised material issues of fact and accordingly remanded the case back to the circuit court for additional proceedings. *See In re Forfeiture of a Quantity of Marijuana*, 805 N.W.2d 217, 225 (Mich. Ct. App. 2011). During a subsequent bench trial, the circuit court examined whether the property seized during the raid was subject to forfeiture and, if so, whether the Ostipows were innocent owners of that property. Once again, the circuit court found that the Ostipows were not innocent owners. *See 2013 Forfeiture*, 2013 WL 5731508, at *2. Back, then, to the Michigan Court of Appeals, which held that Royetta, but not Gerald, was an innocent owner, and thus remanded the case back to the circuit court for a third time. *Id.*

At long last, in August 2016, the circuit court entered a final judgment describing which of the real and personal property was not forfeited. The property deemed non-forfeited included: (1) Royetta's dower interest in the farmhouse, (2) the personal property in the farmhouse's sheds, including a 1965 Chevrolet Nova, and a collection of tools and equipment, (3) ammunition and firearms found in the Ostipows' home, and (4) and certain other personal property. The next day, the Ostipows made a written demand to Saginaw County Sheriff William Federspiel to return and reassemble the non-forfeited property within 21 days. When Federspiel failed to meet those demands, the Ostipows filed this § 1983 action against Federspiel in his individual and official capacities, the Saginaw County Sheriff's Department, and Does 1–10 alleging claims for

(i) trover/conversion, (ii) substantive due process violations, (iii) procedural due process violations, (iv) violation of the Takings Clause of the Fifth Amendment, (v) excessive fines in violation of the Eighth Amendment, (vi) a *Monell* claim, and (vii) violation of the Michigan Freedom of Information Act.

Following discovery, Federspiel and the Sheriff's Department moved for summary judgment. The district court granted judgment to Defendant "Office of Sheriff" on the basis that it was not a separate legal entity subject to suit under Michigan law. *See Ostipow v. Federspiel*, No. 16-CV-13062, 2018 WL 3428689, at *3 (E.D. Mich. July 16, 2018). The district court also dismissed "Deputy Does 1-10." *Id.* at *3–4. That left Federspiel as the only defendant. As to him, the district court rejected the Ostipows' substantive due process claim because none of Federspiel's actions "shock[] the conscience." *Id.* at *5. It likewise rejected the Ostipows' procedural due process claim because they received adequate process during the state trial and appellate proceedings. *Id.* at *5–6. With respect to the Ostipows' takings claim, the district court held that the civil asset forfeiture regime, which is quasi-criminal in nature, does not constitute a taking for public use and thus is not subject to the Fifth Amendment. *Id.* at *6–7. The district court also rejected the Ostipows' excessive fines claim, holding that it was not clearly established that the Eighth Amendment's Excessive Fines Clause applied against the States, and, in any event, that the forfeiture was not "grossly disproportional" to the gravity of the offense. *Id.* at *7–10. Finally, because none of the alleged constitutional violations occurred pursuant to a policy, procedure, or custom of Saginaw County, the district court dismissed the Ostipows' *Monell* claim. *Id.* at *10–11. The district court then declined to extend supplemental jurisdiction over the remaining state-law claims. *Id.* at *11. This appeal followed.

**ANALYSIS**

To obtain relief under 42 U.S.C. § 1983, the Ostipows must demonstrate a (1) right secured by the Constitution and laws of the United States; (2) that was violated; (3) by a person acting under color of state law. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

Federspiel asserts that he is entitled to qualified immunity as to each of the Ostipows' constitutional claims. Qualified immunity is an affirmative defense to a § 1983 claim. It shields a government official from liability so long as his conduct did not violate a clearly established constitutional right. *Gean v. Hattaway*, 330 F.3d 758, 767 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011). When determining whether an official is entitled to immunity, we ask two related questions: (1) did the government actor violate a constitutional right; and (2) was that right clearly established at the time of the alleged violation? *Jones v. City of Elyria*, 947 F.3d 905, 913 (6th Cir. 2020). Unless both questions are answered in the affirmative, a claim will not proceed to trial. *See Baynes v. Cleland*, 799 F.3d 600, 609–10 (6th Cir. 2015).

We note at the outset that we have before us only the Ostipows' claims against Federspiel. The Ostipows named Federspiel as a defendant in both his individual and official capacities. When an officer is sued in his official capacity, the law treats that suit as an action against Saginaw County. *See Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245–46 (6th Cir. 1989).

The district court granted summary judgment to Defendant "Office of Sheriff" because it is not a separate legal entity under Michigan law. *See Ostipow*, 2018 WL 3428689, at *3. The Ostipows at most challenge that in a cursory footnote. Appellant Br. at 3 n.1. An argument raised in a footnote and in a "perfunctory manner unaccompanied by some effort" to develop the point is routinely deemed forfeited. *United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008);

*McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).  That being the case here as to the "Office of Sheriff," we consider only those claims against Federspiel in his official and individual capacities.

### The Takings Claim.

The Ostipows claim they are entitled to recover the value of their improperly seized and sold property as just compensation for Federspiel's violation of the Fifth Amendment's Takings Clause.  The Takings Clause, which applies to the States through the Fourteenth Amendment, commands that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V; *see Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897).  When the government acquires private property for a public purpose, the plain language of the Takings Clause requires that the government pay the property owner.  *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017).  To secure payment, a property owner may sue the government in federal court at the time of the taking for the "deprivation" of a right "secured by the Constitution."  *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019) (quoting 42 U.S.C. § 1983).

Federspiel asserts that he is entitled to qualified immunity as to each of the Ostipows' claims, including the takings claim.  To overcome Federspiel's qualified immunity defense here, the Ostipows must show not only that their injury constitutes a Takings Clause violation, but also that such a violation was clearly established at the time of the alleged violation.  With respect to the latter, we have "repeatedly" been warned not to define the right at "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  To demonstrate that a law is "clearly established," then, the Ostipows must identify a factually similar case that would have given "fair and clear warning" to Federspiel about what the law requires.  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotation omitted).  Controlling precedent, in other words, must "place[] the . . . constitutional

question beyond debate." *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (quoting *al-Kidd*, 563 U.S. at 741).

As the Ostipows first describe things, their claim has the feel of a taking. The government came to their home, took their property, sold it, and have yet to compensate the Ostipows. But upon closer inspection, their claims do not quite match up with traditional Takings Clause jurisprudence. The Ostipows' takings claim does not target the aspect of their story one might expect. They do not contest the scope of the government's initial seizure of their property, the treatment of their property when it was seized, or even the government's sale of that property during the forfeiture proceedings, which they concede occurred pursuant to a then-valid court order. *Ostipow*, 2018 WL 3428689, at *4. The Ostipows instead focus on the 2016 judgment, which declared their ownership over some of the seized property. Characterizing those forfeiture proceedings as a "failure" that constitutes a "taking," the Ostipows now seek their "just compensation."

1. Governments seize property for different reasons, utilizing different theories of power. When a government commits a taking for public use, it does so under its civil, eminent domain powers. A classic example is taking private property to build a public road through the property. When it does so, the government owes the property owners compensation for the land it took.

Governments also seize property utilizing their police powers, which are criminal in nature. *See, e.g.*, *United States v. Droganes*, 728 F.3d 580, 591 (6th Cir. 2013). Indeed, it is well settled that a state's seizing and retaining property as part of a criminal investigation is not a "taking" for a "public purpose" under the Fifth Amendment, and thus does not give rise to a claim for just compensation. *Bennis v. Michigan*, 516 U.S. 442, 452–53 (1996); *see also AmeriSource Corp. v. United States*, 525 F.3d 1149, 1155 (Fed. Cir. 2008) (noting that "the character of the government

7

action is the sole determining factor" as to whether a plaintiff may bring a compensable takings claim).

Indeed, several circuits have concluded that the use of police power to lawfully seize and retain property categorically bars a Takings Clause claim. *See, e.g.*, *Lech v. Jackson*, 791 F. App'x 711, 717 (10th Cir. 2019), *cert. denied*, No. 19-1123 (June 29, 2020) (dismissing a takings claim brought by innocent plaintiffs whose home was destroyed after police officers used an armored vehicle and explosives to apprehend a suspect who fled officers and sneaked into the plaintiffs' house); *Zitter v. Petruccelli*, 744 F. App'x 90, 96 (3d Cir. 2018) (finding no takings claim because officers acquired the ultimately destroyed property pursuant to a lawful search warrant); *Johnson v. Manitowoc County*, 635 F.3d 331, 333–34, 336 (7th Cir. 2011) (describing a takings claim as a "non-starter" when damage to a landlord's home occurred as a result of actions taken under the state's police power); *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331–32 (Fed. Cir. 2006) (collecting cases and dismissing a takings claim where the government seized property, failed to initiate forfeiture proceedings for four years, ultimately agreed to dismiss the forfeiture action, but did not return the property until its only value was as scrap).

So too here. The Ostipows' property was seized pursuant to uncontested warrants authorizing the search and seizure of property believed to be involved in drug manufacturing. The Saginaw County prosecutor, in turn, initiated forfeiture proceedings against that property. The weight of authority holds that claims emanating from the use of police power are excluded from review under the Takings Clause. To the extent there conceivably is merit to the Ostipows' suggestion that civil asset forfeiture actions specifically should be reviewed under the Takings Clause, no such rule is clearly established, meaning Federspiel is entitled to qualified immunity on that claim.

In reaching this conclusion, we do not mean to suggest that victims of civil asset forfeiture abuse have no recourse under the Constitution. For example, a litigant might invoke the Due Process Clause, rather than the Takings Clause, to argue for heightened scrutiny in reviewing a state's determination that any seized property was an instrument to or proceed of a crime. *See, e.g.*, *Leonard v. Texas*, 137 S. Ct. 847 (2017) (Thomas, J., respecting denial of cert.). And it is perhaps no coincidence that several states, including Michigan, recently have taken steps to curb forfeiture abuses. *See, e.g.*, 2019 Mich. Pub. Acts. 7, 8, 9. This area of law, in other words, is one that appears to be evolving, even if that evolution does not help the Ostipows today.

2. Resisting this conclusion, the Ostipows assert that their ultimate success in state court transforms this case from one about the exercise of police power into one implicating the Takings Clause. That result, they say, is required by the Supreme Court's recent decision in *Nelson v. Colorado*, 137 S. Ct. 1249 (2017). *Nelson* invalidated a Colorado law that required defendants whose convictions had been reversed or vacated to later prove their innocence before they would be refunded the costs, fees, and restitution paid in connection with their invalid conviction. *Id.* at 1254–58. But *Nelson* did so on procedural due process grounds; it did not address a takings claim. *Id.* at 1252.

That the Ostipows received a judgment in their favor does not change our conclusion. Regrettably, the Ostipows have now waited over three-and-a-half years to be paid on that judgment (perhaps in part due to the length of this litigation). Yet even then, no clearly established takings claim exists. Over a century ago, the Supreme Court held that the property right created by a judgment against a government entity is not a right to payment at a particular time; it is instead a recognition of a continuing debt of that government entity. *Louisiana ex rel. Folsom v. Mayor of New Orleans*, 109 U.S. 285, 289 (1883). And so while the Ostipows have a property right in their

judgment, there is no evidence that property right ultimately will not be honored. *See, e.g.*, *Freeman Decorating Co. v. Encuentro Las Ams. Trade Corp.*, 352 F. App'x 921, 924 (5th Cir. 2009) (citing *Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 132 (5th Cir. 1986) (a school board's delay in satisfying a judgment does not create the deprivation of a property right)). At least so far, Federspiel has not explicitly refused to satisfy the judgment. *Compare* Appellee Br. at 19, 32 (explaining that Saginaw County has to follow certain procedures before it can approve the Sheriff's expenditures), *with Wayside Church v. Van Buren County*, 847 F.3d 812, 823 (6th Cir. 2017) (Kethledge, J., dissenting) (arguing that a ripe takings claim existed where "the defendant Van Buren County took property worth $206,000 to satisfy a $16,750 debt, and then refused to refund any of the difference," explaining that in "some legal precincts that sort of behavior is called theft"). Rather, Federspiel has repeatedly recognized that debt. The Sheriff and his office purport to be working with the Saginaw County's Prosecutor's Office for guidance on the amount owed. Appellee Br. at 19, 32. Yet Federspiel claims that this suit, filed three weeks after entry of the state court judgment, simply did not afford sufficient time for the court or the Prosecutor's Office to provide such guidance. *Id.* Once that determination is resolved and the funds are allocated by the County Board of Commissioners, however, Federspiel asserts that the County Treasurer will pay the value of the judgment to the Ostipows. *See* Appellee Br. at 32–33; Mich. Comp. Laws § 600.6093.

3. While we resolve the Ostipows' takings claim in Federspiel's favor, we disagree with his suggestion that the Ostipows do not have a "final judgment." In making that suggestion, Federspiel invokes a procedural relic that long plagued our Takings Clause jurisprudence. These difficulties trace back to *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), which established a two-part test to determine when a takings claim is

ripe. Under that test, a takings claim could be brought in federal court only after (1) the plaintiff received a "final decision" from the relevant government actor; and (2) the plaintiff sought "compensation through the procedures the State has provided for doing so." *Wayside Church*, 847 F.3d at 818. Depending upon the state, those procedures often included not only routine exhaustion of administrative procedures, but additional, typically cumbersome, state-imposed remedies, such as requiring the property owner to initiate reverse condemnation proceedings. *Williamson*, 473 U.S. at 196–97; *see Lumbard v. City of Ann Arbor*, 913 F.3d 585, 589–90 (6th Cir. 2019). But the Supreme Court recently overruled *Williamson*. Today, "a taking without compensation violates the self-executing Fifth Amendment at the time of the taking," meaning "the property owner can bring a federal suit at that time." *Knick*, 139 S. Ct. at 2172. It follows that after *Knick*, if an ancillary proceeding were required (akin to an inverse condemnation proceeding), the Ostipows would not have to exhaust that avenue before asserting a takings claim in federal court. *Id.*

Of course, the Ostipows' proceedings are before us in a different posture. A civil asset forfeiture action was initiated against the Ostipows' property, and the Ostipows ultimately received a favorable judgment ordering the return of that property. In this setting, Michigan law does not appear to require the Ostipows to initiate a separate adjudication to satisfy their judgment. We asked for supplemental briefing on this very question, and neither party supplied answers as to what, exactly, the parties must do to determine a sum certain for the judgment. Federspiel merely reiterated that the Ostipows "have never presented proofs for judicial determination of the amount of compensation due"; the Ostipows, in turn, claim nothing more is required, believing they should have received a check or their property back immediately upon the judgment's being entered in their favor.

11

While perhaps providing few answers, the parties' supplemental briefs do shed light on how the parties might proceed from here. The parties appear to either disagree or lack clarity as to certain aspects of the state-court judgment. For example, the parties seem to have different views about how to compensate the Ostipows for their "full ownership interest." Are the Ostipows entitled to the proceeds of the sale of their property—presumably a fixed number available to Federspiel—or to the property's fair market value, as the Ostipows claim? *See* Appellant Br. at 38 n.11; Appellant Supp. Br. at 2–3; *see also Ostipow*, 2018 WL 3428689, at *5 (citing *In re Forfeiture of $256 and One 1978 Oldsmobile*, 517 N.W.2d 732, 734 (Mich. 1994) for the proposition that "the prior disposition of the assets will not bar entry of an order directing the plaintiff to return the assets or the proceeds from the disposition of the assets"). The parties also appear to disagree over the amount and continuing validity of Royetta's dower interest. *See generally Zaher v. Miotke*, 832 N.W.2d 266, 271 (Mich. Ct. App. 2013) (noting that a dower interest is one-third of the property); *In re Forfeiture of $234,200*, 551 N.W.2d 444, 448 (Mich. Ct. App. 1996) (conferring standing on decedent's heirs to pursue decedent's innocent-ownership defense in forfeiture proceedings).

Michigan law provides numerous mechanisms to assist judgment creditors and debtors in clarifying and enforcing a judgment, from subpoenas to motion practice to extraordinary writs. *See, e.g.*, Mich. Comp. Laws §§ 600.6101–600.6143; Mich. Ct. R. 2.620–21. For instance, a subpoena might issue to determine the sale price of the farmhouse, the car, and other items. Likewise, a request for modification of the judgment might clarify whether the Ostipows are entitled to the proceeds of the sale of their property or to the fair market value of their property at the time of sale. And if it is the latter, a post-judgment evidentiary hearing might help determine

that value. But at day's end, it is the state court's duty to oversee and ensure the satisfaction of the Ostipows' judgment. With this appeal resolved, we trust that satisfaction will occur expeditiously.

*The Substantive Due Process Claim.*

The Ostipows' substantive due process claim targets the same conduct as their takings claim. And it fares no better. To invoke substantive due process protections, a purported right must implicate one of the three fundamental categories protected by that clause—life, liberty, or property. *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003). When one of those fundamental interests is at stake, substantive due process limits governmental action or inaction that is "arbitrary," *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 453 (6th Cir. 2002), or "shocks the conscience." *Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 678 (6th Cir. 2016); *see County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). We view such claims with a dose of skepticism, as "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 128 (1992) (explaining that substantive due process is not intended to provide "rules of conduct" or best practices to regulate how we "liv[e] together in society"). And, of notable relevance here, the doctrine may not be used as a stand-in to address a failed takings claim. *Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 1292, 1304 (11th Cir. 2019) (Newsom, J., concurring in the judgment).

After eight years of state litigation, the Ostipows have every right to be aggravated over the delay in Saginaw County satisfying their judgment. As frustrating as those actions may be, however, Federspiel's conduct does not "shock[] the conscience." *See Gohl*, 836 F.3d at 678. A valid court order, issued after the Ostipows had an opportunity to be heard, instructed that the Ostipows' property was forfeited "to the Saginaw County Sheriff's Department" to "be disposed of by said Department as provided by statute, MCL 333.7524." It was not until seven years later—

after a second trial court proceeding following a second remand from the Michigan Court of Appeals, and long after the property was sold—that the order was partially modified. Absent a stay of execution of the initial order, Federspiel seemingly was free to act upon the order's command.

While the court order directing Federspiel to dispose of the property eventually was partially reversed, Michigan law provides the Ostipows at least one remedy: entitlement to the proceeds of the sale of their property during the forfeiture proceeding. *See In re Forfeiture of $256 and One 1978 Oldsmobile*, 517 N.W.2d at 734. And they received a remedy when the Saginaw County Circuit Court issued a judgment in their favor, a point Federspiel does not dispute. Equally true, as previously explained, there is no right to instantaneous satisfaction of a judgment when a governmental entity is involved. *Folsom*, 109 U.S. at 289.

*The Procedural Due Process Claim.*

The Ostipows next claim that their procedural due process rights were violated when they were required to post a bond to stay execution of the circuit court's forfeiture decision while they appealed that decision. By command of the Fourteenth Amendment, no State may "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. To prevail on their procedural due process claim, the Ostipows thus must prove that Federspiel deprived them of a "liberty or property interest" without affording them the procedural protections the Constitution requires. *Phillips v. McCollom*, 788 F.3d 650, 653 (6th Cir. 2015).

One part of their claim is easily established. No one disputes the Ostipows have a property interest in the real and personal property seized from them in connection with Steven's arrest.

But the remaining part of their claim—that they were denied procedural protections—is another story. The Ostipows say those protections were denied when they were required to post a

supersedeas bond to stay the execution of forfeiture pending appeal. Assuming, for purposes of argument, that Federspiel is the proper party against whom to assert this claim, *accord Ostipow*, 2018 WL 3428689, at *6, the Ostipows' claim still fails.

A supersedeas bond, also commonly known as an appellate bond, is a standard requirement in many courts, including our own. *See, e.g.*, Fed. R. App. P. 8; Ohio Civ. R. 62; N.Y. C.P.L.R. § 5519; Cal. Code Civ. Proc. § 917.1. As was the case here, losing litigants in the trial court are often asked to post a supersedeas bond to stay execution of the trial court's judgment, pending the outcome of their appeal. The bond is not part of the civil asset forfeiture regime; it is a general rule of Michigan civil procedure applicable to a variety of civil appeals. *See* Mich. Ct. R. 7.209.

While the supersedeas bond requirement may seem unfair to the Ostipows, particularly now that their claims have been partially vindicated, it did not impermissibly burden their procedural due process rights. The Ostipows were able to challenge the forfeiture of their property in the trial court. They received notice of the proceedings, filed an answer, and, upon receiving an unfavorable judgment, took an appeal. The bond requirement, in other words, did not alter their ability to challenge the seizure of their property. It merely hindered their ability to stay execution of the judgment pending appeal.

And perhaps most critically, the Ostipows had the opportunity to challenge that bond when it was imposed. The circuit court granted their request to stay the forfeiture proceedings pending appeal, subject to the Ostipows posting the bond. The Ostipows then asked the Michigan Court of Appeals to lift the bond condition. In making that request, the Ostipows never alleged any financial hardship or inability to meet the bond requirements, nor did they offer to provide a different type of bond, such as a surety bond. Without any reason to alter the bond requirements, the appellate court left the circuit court's order intact.

The Ostipows gain no mileage from *In re Forfeiture of 2000 GMC Denali*, 892 N.W.2d 388 (Mich. Ct. App. 2016). The plaintiff there challenged Michigan's requirement to post a bond before challenging civil asset forfeiture proceedings in the trial court. *Id.* at 391. Because the plaintiff could not afford to post a bond, the Michigan Court of Appeals held that the bond requirement, as applied, denied the plaintiff her "opportunity for a hearing," meaning that certain provisions of the forfeiture statute were unconstitutional as applied. *Id.* at 400. Michigan has now eliminated this requirement. *See* Mich. Comp. Laws § 333.7522. But this has no impact on the Ostipows. For one thing, *Denali* did not involve supersedeas bonds. For another, the Ostipows, unlike the plaintiff in *Denali*, paid the bond necessary to challenge the forfeiture proceedings in the circuit court. And in any event, despite having their property sold during the pendency of their appeal due to their failure to pay the supersedeas bond, the Ostipows were still entitled to alternative remedies should their claims be vindicated on appeal. *See In re Forfeiture of $53.00*, 444 N.W.2d 182, 184 (Mich. Ct. App. 1989). When vindication came to pass, the circuit court issued a judgment in the Ostipows' favor. There was thus no due process violation.

*The Excessive Fines Claim.*

The Ostipows' Excessive Fines Clause claim suffers the same fate. The Ostipows allege that Federspiel violated the Eighth Amendment by imposing an excessive fine "in the form of the value of the forfeiture of [Gerald's] interest in the [f]armhouse and its contents[.]" Compl. ¶67. But we do not have to pass on whether Federspiel violated the Eighth Amendment here. Either way, the law was not "clearly established" at the time of the alleged misconduct.

In relevant part, the Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed . . . ." U.S. CONST., amend. VIII. The Ostipows rely on *United States v. Bajakajian*, 524 U.S. 321, 331 n.6 (1998) to support their claim that not only

is seizure and forfeiture of their property an excessive fine, but also that such a violation was clearly established at the time. But twelve years after *Bajakajian*, the Supreme Court acknowledged it "never [had] decided whether the Third Amendment or the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause." *McDonald v. City of Chicago*, 561 U.S. 742, 765 n.13 (2010). We likewise had not explicitly ruled on whether the Excessive Fines Clause applied against the States. *See Ross v. Duggan*, 402 F.3d 575, 588 (6th Cir. 2004) (assuming without comment that the Excessive Fines Clause applied against the States to affirm dismissal of an excessive fines claim). Indeed, it was not until just last year that the Supreme Court, in *Timbs v. Indiana*, 139 S. Ct. 682 (2019), decided that the Excessive Fines Clause applied to the States and did so in the context of civil *in rem* forfeiture proceedings.

Given that neither Federspiel nor the Michigan courts had the benefit of *Timbs* at any point during the forfeiture proceedings, whether a forfeiture may constitute an excessive fine in violation of the Eighth Amendment was not "clearly established," for purposes of asserting a § 1983 claim. As such, Federspiel is entitled to qualified immunity on this claim as well.

### *The Monell Claim.*

Lastly, the Ostipows challenge the dismissal of their claim asserted pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), on the basis that they did not have sufficient notice that Federspiel had moved for summary judgment on those claims. The record suggests otherwise. Federspiel moved for summary judgment on all "constitutional claims," and, relatedly, asked the district court to "dismiss[] this litigation with prejudice." As such, there was no notice issue. The Ostipows had the opportunity either to brief their *Monell* claim or, at the very least, alert the district court that they believed Federspiel had not sufficiently raised the matter. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). We thus see no error here either.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.